**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 12-1899**

———————

ANTHONY LAWRENCE DASH,

     Plaintiff - Appellant,

  v.

FLOYD MAYWEATHER, JR., an individual; MAYWEATHER PROMOTIONS;
MAYWEATHER PROMOTIONS LLC, a/k/a Mayweather Promtions LLC;
PHILTHY RICH RECORDS INC.; WORLD WRESTLING ENTERTAINMENT
INC.,

     Defendants - Appellees.

———————

Appeal from the United States District Court for the District of
South Carolina, at Columbia.  Joseph F. Anderson, Jr., District
Judge.  (3:10-cv-01036-JFA)

———————

Argued:  March 20, 2013   Decided:  September 26, 2013

———————

Before DAVIS and THACKER, Circuit Judges, and Mark S. DAVIS,
United States District Judge for the Eastern District of
Virginia, sitting by designation.

———————

Affirmed by published opinion.  District Judge Davis wrote the
opinion, in which Judge Thacker joined.  Circuit Judge Davis
wrote a separate opinion concurring in the judgment.

———————

**ARGUED:** William Angus McKinnon, MCGOWAN, HOOD & FELDER, LLC,
Rock Hill, South Carolina, for Appellant.  Mark G. Tratos,
GREENBERG TRAURIG, Las Vegas, Nevada; Jerry S. McDevitt, K&L
GATES, LLP, Pittsburgh, Pennsylvania, for Appellees.  **ON BRIEF:**
John G. Felder, Jr., MCGOWAN, HOOD & FELDER, LLC, Columbia,

South Carolina; Thomas L. Moses, MONAHAN & MOSES, LLC, Greenville, South Carolina, for Appellant. Curtis B. Krasik, K&L GATES, LLP, Pittsburgh, Pennsylvania, Joshua W. Dixon, K&L GATES, LLP, Charleston, South Carolina, for Appellee World Wrestling Entertainment, Inc.; Bethany Rabe, GREENBERG TRAURIG, Las Vegas, Nevada, P. Benjamin Zuckerman, BUCKINGHAM, DOOLITTLE & BURROUGHS, Boca Raton, Florida, for Appellees Floyd Mayweather, Jr., Mayweather Promotions, Mayweather Promotions LLC, and Philthy Rich Records Inc.

---

DAVIS, District Judge:

In this copyright infringement case, Anthony Lawrence Dash ("Dash") alleges that Floyd Mayweather, Jr. ("Mayweather"), Mayweather Promotions, Mayweather Promotions LLC, Philthy Rich Records, Inc., and World Wrestling Entertainment, Inc. ("WWE"), (collectively "Appellees"), violated his copyright by playing a variant of Dash's copyrighted music during Mayweather's entrance at two WWE events. Dash appeals from the district court's grant of summary judgment on the issue of his entitlement to damages under 17 U.S.C. § 504(b). For the reasons set forth below, we affirm.

I.

A.

In 2005, Dash composed an instrumental music track entitled "Tony Gunz Beat" ("TGB"). Dash has created a number of musical tracks; however, Dash has never received revenue from TGB or any other musical composition.

On February 7, 2008, Mayweather, a well-known boxer, entered into a contract with the WWE under which Mayweather agreed to promote and perform at a live WWE pay-per-view event: Wrestlemania XXIV. Tickets for Wrestlemania XXIV were sold out at the time the parties entered into the contract. The contract did not address the music to be played during Mayweather's appearance at the event, nor did the parties discuss

3

Mayweather's entrance music at the time they entered into the contract.

At some point prior to Wrestlemania XXIV, the WWE communicated to Mayweather that it had selected a song by the musical artist 50 Cent to be played as Mayweather entered the ring at the event. However, the night before Wrestlemania XXIV, one of Mayweather's associates communicated to the WWE that Mayweather would be entering to a different song, entitled "Yep." Mayweather's manager provided the WWE with a CD containing the song and represented that Mayweather owned all rights to the song and was granting the WWE rights to use it in connection with his appearance. On March 30, 2008, Mayweather appeared at Wrestlemania XXIV, entering the arena to "Yep," which played for approximately three minutes. Dash claims that "Yep" combines lyrics with his now-copyrighted instrumental music, TGB.

On August 19, 2009, Mayweather entered into a second contract with the WWE in which he agreed to appear as a "Raw Guest Host" on the WWE's August 24, 2009 broadcast of its live weekly program, RAW. Like the Wrestlemania XXIV contract, this contract did not include any terms or conditions related to Mayweather's entrance music. On August 24, 2009, in accordance with the RAW contract, Mayweather appeared as a live guest host

4

on RAW. As in Wrestlemania XXIV, "Yep" was played in connection with Mayweather's appearance.

Although Dash alleges that he created TGB in 2005, he did not file a copyright application for the beat with the United States Copyright Office until sometime in 2009. Dash then received a Certificate of Registration providing an effective date of registration for TGB of October 13, 2009. (J.A. 33). Dash claims that Appellees' use of "Yep" in connection with both of Mayweather's WWE appearances infringed his copyright in TGB. Therefore, the claimed infringement is alleged to have occurred after Dash composed TGB, but before his copyright registration became effective.

For the purpose of summary judgment, the parties stipulated to the existence and amount of several revenue streams associated with Wrestlemania XXIV and the August 24, 2009, RAW broadcast.[1] The parties further stipulated as follows:

---

[1] Dash claims the following revenue streams with respect to the WWE: (1) ticket sales from Wrestlemania XXIV; (2) pay-per-view buys of Wrestlemania XXIV; (3) revenues from the webcast of Wrestlemania XXIV; (4) home videos of Wrestlemania XXIV; (5) live event merchandise from Wrestlemania XXIV; (6) the Wrestlemania XXIV event program; (7) revenues from the television broadcast of Wrestlemania XXIV; (8) ticket sales from the August 24, 2009, RAW broadcast; (9) television rights fees from the August 24, 2009, RAW broadcast; (10) Canadian television advertising during the August 24, 2009, RAW broadcast; (11) live event merchandise from the August 24, 2009, RAW broadcast; and (12) the event program from the August 24, 2009, RAW broadcast. (J.A. 933).

5

7. [Dash] has adduced no evidence that the playing of the "Yep" song at Wrestlemania XXIV or the August 24, 2009 RAW show increased any of the WWE revenue streams . . . beyond that which would have existed without the song "Yep."

8. [Dash] has adduced no evidence that WWE received any additional revenue beyond that which would have existed without the song "Yep," in any of the revenue streams for Wrestlemania XXIV or the August 24, 2009 RAW show . . . due to the use of the "Yep" song by Mayweather.

Id.

B.

Dash filed this copyright infringement action against Appellees on April 26, 2010. Dash initially sought preliminary and permanent injunctive relief, actual damages, profit damages from both Wrestlemania XXIV and the August 24, 2009, RAW broadcast, and statutory damages, all as set forth in 17 U.S.C. § 504. Dash later amended his Complaint to remove his request for statutory damages. As the district court observed, because Dash had not registered his copyright prior to the alleged infringement, statutory damages were not available to him. See Dash v. Mayweather, No. 3:10cv1036-JFA, 2012 WL 1658934, at *4 (D.S.C. May 11, 2012).

Following several discovery disputes between the parties and upon Appellees' motion, the district court bifurcated the proceedings with respect to liability and damages. The parties then filed a joint motion asking the district court to address

6

Dash's entitlement to damages under § 504 before reaching the question of Appellees' liability for infringement. The district court granted this motion and ordered Appellees to submit partial summary judgment motions concerning Dash's entitlement to actual and profit damages under § 504(b), which Appellees later filed.

In response, Dash filed a report prepared by a retained expert, Dr. Michael Einhorn, discussing the amount of both actual and profit damages Dash should receive based on the alleged infringement (the "Einhorn Report"). The Einhorn Report described certain background information concerning Dash's history as an artist and the general importance of music to the WWE. It then addressed Dash's entitlement to damages under § 504(b). Regarding actual damages, the Einhorn Report listed four benchmark licensing fees paid to other artists for the use of their music at Wrestlemania XXIV. Based on those fees, the Einhorn Report stated that Dash "would have earned a maximal sum of $3,000 for the use of his musical composition." (J.A. 1088). Accordingly, the Einhorn Report concluded that Dash's actual damages were "no more than $3,000." Id. at 1082.

With respect to profit damages, the Einhorn Report reviewed the WWE's various profit streams attributable to Wrestlemania XXIV, calculated the value of Mayweather's appearance at that event relative to the net profits derived from the event, and

7

then calculated the value of "Yep" to Mayweather's appearance based on the minutes of use relative to the length of Mayweather's performance. Id. The Einhorn Report concluded that $541,521 of the WWE's net profit from Wrestlemania XXIV was attributable to the WWE's infringing use of TGB. Id. at 1090. The Einhorn Report performed the same calculation with respect to the net profits that Mayweather derived directly from his appearance at Wrestlemania XXIV, concluding that $480,705 of such profits was attributable to the infringing use. Id. at 1091. The Einhorn Report did not conduct similar analyses concerning the August 24, 2009, RAW broadcast, concluding that there was not sufficient information to apportion a share of the Appellees' net profits to the infringing use of TGB. Id. at 1082. Therefore, based only on the calculations related to Wrestlemania XXIV, the Einhorn Report concluded that Dash should receive "no less than . . . $1,019,226," over and above any actual damages received, "to disgorge" the profits Appellees derived from their alleged infringement of Dash's copyrighted music.[2] Id.

---

[2] We observe that the sum of the apportioned net profits recited in the Einhorn Report is $1,022,226 and not $1,019,226. (J.A. 1090-91). It appears that Dr. Einhorn subtracted his maximal estimation of Dash's actual damages from the total profit damages in reaching the figure of $1,019,226, although he did not address this apparent step in his analysis.

On May 9, 2012, the district court held a hearing on Appellees' motions for summary judgment. Following the hearing, the district court issued an order granting both motions, finding that Dash was not entitled to either actual or profit damages under § 504(b). Addressing profit damages first, the district court considered the issue of Dash's entitlement to a portion of the profits Appellees derived from Wrestlemania XXIV and from the August 24, 2009, RAW broadcast. With respect to these profit damages, the district court found that Dash had failed to satisfy his initial burden of proof under this Circuit's burden shifting approach to § 504(b). Specifically, in light of Dash's stipulation that the playing of "Yep" did not increase the revenues of either event beyond what such revenues would have otherwise been, the district court found that Dash had failed to present evidence demonstrating a causal link between the alleged infringement and the enhancement of any revenue stream claimed by Dash. In the absence of such evidence, the district court concluded that there was "no conceivable connection" between the alleged infringement and the claimed revenues and that, absent evidence establishing such a connection, summary judgment was appropriate on the issue of profit damages. Dash, 2012 WL 1658934, at *3.

The district court also held that Dash was not entitled to recover any actual damages under § 504(b). In so holding, the

9

district court found that Appellees had offered evidence that TGB did not have a market value, specifically, the lack of any reported income on Dash's tax returns and the absence of any other proof that he had previously sold his musical compositions. In response, Dash relied only on the Einhorn Report's calculation of TGB's "maximal value," which was based on the fees paid to other entertainers at Wrestlemania XXIV. The district court found that the Einhorn Report's estimation of TGB's market value amounted to nothing more than speculation, because the entertainers whose fees the Einhorn Report used as benchmarks were not similarly situated to Dash. As Dash had offered no other evidence to show that TGB had a market value, the district court held that Dash had failed to "offer[] sufficient, concrete evidence to indicate an actual value of the beat," and concluded that Appellees were therefore entitled to "summary judgment on the actual damages claim." Id. at *5. Because the district court found that Dash was not entitled to any profit or actual damages,[3] it further held that the case

---

[3] In concluding that Dash was not entitled to any relief in the underlying action, the district court held that it did not need to address Dash's claim for injunctive relief because Mayweather had agreed not to use "Yep" again and, even if Mayweather did use the song again, Dash's copyright of TGB would present the district court with a much different question. Dash does not appeal this decision, so the question of his entitlement to such relief is not before this Court.

would not proceed to the liability phase, dismissed the pending discovery motions as moot, and directed that the case be closed.

Dash moved for reconsideration of the district court's order, which motion the district court denied. Dash now appeals both the district court's original grant of summary judgment and its denial of reconsideration with respect to his entitlement to actual and profit damages under § 504(b).

## II.

We review a grant of summary judgment de novo, applying the same standard as the trial court and without deference to the trial court.[4] Couch v. Jabe, 679 F.3d 197, 200 (4th Cir. 2012) (quoting Nader v. Blair, 549 F.3d 953, 958 (4th Cir. 2008)). In conducting such review, we construe the evidence, and all reasonable inferences that may be drawn from such evidence, in

---

[4] As noted above, Dash also appealed the district court's denial of his Rule 59(e) motion for reconsideration, (J.A. 616); however, Dash neither briefed nor argued this issue on appeal. See Fed. R. App. P. 28(a)(9) (requiring an appellant to brief all issues raised on appeal); see also Edwards v. City of Goldsboro, 178 F.3d 231, 241 n.6 (4th Cir. 1999) (holding that failure to comply with Rule 28(a)(9) "triggers abandonment of that claim on appeal"); Cavallo v. Star Enter., 100 F.3d 1150, 1152 n.2 (4th Cir. 1996). Because Dash briefed and argued only the merits of summary judgment, Dash has abandoned his appeal of the district court's denial of his Rule 59(e) motion for reconsideration. Had Dash not abandoned this claim, we would have reviewed it for abuse of discretion, a much more deferential standard than the de novo standard applied to our review of the district court's grant of summary judgment. See Brown v. French, 147 F.3d 307, 310 (4th Cir. 1998).

the light most favorable to the nonmoving party. PBM Prods., LLC v. Mead Johnson & Co., 639 F.3d 111, 119 (4th Cir. 2011). Summary judgment is appropriate only when "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a).

Any party may seek summary judgment, regardless of whether he may ultimately bear the burden of proof under the relevant statutory scheme—as a copyright infringer may under 17 U.S.C. § 504(b). Bouchat v. Balt. Ravens Football Club, Inc., 346 F.3d 514, 521–22 (4th Cir. 2003). Irrespective of the burdens assigned by the applicable substantive law, Federal Rule of Civil Procedure 56 requires the movant to show that summary judgment is warranted. Fed. R. Civ. P. 56(a). We have observed that once the movant has satisfied this "initial burden" of demonstrating the absence of a genuine dispute as to any material fact, the nonmoving party must show that a genuine dispute does, in fact, exist. Bouchat, 346 F.3d at 522 (citing Matsushita Elec. Co., v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986)). A party raises a genuine issue of material fact with respect to a claim only if a reasonable jury could return a verdict for that party on each element necessary to that claim. Banca Cremi, S.A. v. Alex. Brown & Sons, Inc., 132 F.3d 1017, 1027 (4th Cir. 1997).

Although the court must draw all justifiable inferences in favor of the nonmoving party, the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Stone v. Liberty Mut. Ins. Co., 105 F.3d 188, 191 (4th Cir. 1997).  Rather, "a party opposing a properly supported motion for summary judgment . . . must 'set forth specific facts showing that there is a genuine issue for trial.'"  Bouchat, 346 F.3d at 522 (quoting Fed. R. Civ. P. 56(e) (2002) (amended 2010)).  If the adverse party fails to provide evidence establishing that the factfinder could reasonably decide in his favor, then summary judgment shall be entered "regardless of '[a]ny proof or evidentiary requirements imposed by the substantive law.'"  Id. (quoting Anderson, 477 U.S. at 248).  Guided by this standard of review, we analyze the merits of Dash's appeal.

### III.

Dash contends that the district court erred in granting summary judgment on his claims for actual and profit damages. Title 17, United States Code, Section 504(a) provides that "an infringer of copyright is liable for either (1) the copyright owner's actual damages and any additional profits of the infringer, as provided in subsection (b); or (2) statutory

13

damages, as provided by subsection (c)."[5]  With respect to the availability of actual and/or profit damages, Section 504(b) provides that:

> The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages.

17 U.S.C. § 504(b).  Thus, the statute aims to both compensate for the injury resulting from infringement and to strip the infringer of the profits generated from infringement, in order to "make[] clear that there is no gain to be made from taking someone else's intellectual property without their consent." Walker v. Forbes, Inc., 28 F.3d 409, 412 (4th Cir. 1994). Recognizing the wide range of copyrightable material and the numerous considerations involved in quantifying the losses and gains that result from infringement, this Court has emphasized that damages under § 504(b) are to be determined via a "case-by-case assessment of the factors involved, rather than [by] application of hard and fast rules."  Id.

Under the plain language of § 504, the copyright owner is first entitled to any actual damages resulting from infringement

---

[5] As noted above, Dash amended his Complaint to remove his claim for statutory damages under § 504(c).  Accordingly, the only question before the district court—and now this Court—was Dash's entitlement to damages under § 504(b).

and then to certain profit damages, but only to the extent such profit damages are not contemplated in the calculation of the plaintiff's actual damages. See 17 U.S.C. § 504(b). Accordingly, we look first to the question of Dash's entitlement to actual damages under § 504(b) before considering whether he is entitled to a portion of the profits derived from Wrestlemania XXIV and the August 24, 2009, RAW broadcast.

## A.

The Copyright Act entitles a copyright owner to recover "the actual damages suffered by him or her as a result of the infringement . . . ." 17 U.S.C. § 504(b). The statute does not define the term "actual damages," nor does it prescribe a method for calculating such damages. Generally, the term "actual damages" is "broadly construed to favor victims of infringement." On Davis v. The Gap, Inc., 246 F.3d 152, 164 (2d Cir. 2001) (collecting cases and commentaries).

Consistent with this approach, courts have recognized several methods for calculating the compensable loss suffered by a copyright owner as a result of infringement. It is generally accepted that "the primary measure of recovery is the extent to which the market value of the copyrighted work at the time of the infringement has been injured or destroyed by the infringement." Fitzgerald Publ'g Co., Inc. v. Baylor Publ'g Co., Inc., 807 F.2d 1110, 1118 (2d Cir. 1986); Mackie v. Rieser, 296

15

F.3d 909, 917 (9th Cir. 2002) (quoting Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc., 772 F.2d 505, 512 (9th Cir. 1985)). The fair market value of a copyrighted work is derived from an objective, not a subjective, inquiry. Mackie, 296 F.3d at 917 (general claims of "hurt feelings" or an owner's "personal objections to the manipulation of his artwork" do not factor into the determination of the work's fair market value).

Injury to a copyrighted work's market value can be measured in a variety of ways. The first possible measure is the amount of revenue that the copyright holder lost as a result of infringement, such as his own lost sales of the work. Polar Bear Prods., Inc. v. Timex Corp., 384 F.3d 700, 708 (9th Cir. 2004). Another cognizable measure is the fair market value of the licensing "fee the owner was entitled to charge for [the infringer's] use" of his copyrighted work. On Davis, 246 F.3d at 165 ("If a copier of protected work, instead of obtaining permission and paying the fee, proceeds without permission and without compensating the owner, . . . the owner has suffered damages to the extent of the infringer's taking without paying what the owner was legally entitled to exact a fee for."). "In order to make out his claim that he suffered actual damage because of the infringer's failure to pay the fee, the owner

16

must show that the thing taken had a fair market value."[6] Id. at 166.

Regardless of the measure or combination of measures used to establish actual damages, a copyright holder asserting such damages "must prove the existence of a causal connection between the alleged infringement and some loss of anticipated revenue." Thoroughbred Software Int'l, Inc. v. Dice Corp., 488 F.3d 352, 358 (6th Cir. 2007). Although the nature of actual damages will often require a court to "engage in some degree of speculation," Stevens Linen Assocs., Inc. v. Mastercraft Corp., 656 F.2d 11, 14 (2d Cir. 1981), the amount of damages sought cannot be based

---

[6] In On Davis, the Second Circuit decided that "as between leaving the victim of the illegal taking with nothing, and with charging the illegal taker with the reasonable cost of what he took, the latter, at least in some circumstances, is the preferable solution." On Davis, 246 F.3d at 166. Specifically, to rule out actual damages in cases where the owner "may be incapable of showing a loss of either sales or licenses to third parties . . . would mean that in such circumstances an infringer may steal with impunity." Id. In emphasizing these points, however, the Second Circuit was discussing the importance of construing § 504(b)'s "actual damages" provision broadly enough to include "the owner's loss of the fair market value of the license fees he might have exacted of the defendant." Id. On Davis expressly limited the circumstances under which a lost licensing fee could be recovered to those instances in which "the owner [can] show that the thing taken had a fair market value." Id. As discussed below, Dash has not presented sufficient nonspeculative evidence to show that TGB had a fair market value. Accordingly, Appellees cannot be charged "with the reasonable cost of what [they] took," because there is not sufficient evidence to establish (in the context of Appellees' properly supported motions for summary judgment) that such a reasonable cost exists. Id.

17

on "undue speculation," On Davis, 246 F.3d at 166. In the summary judgment context, once a defendant has properly supported his claim that there are no actual damages resulting from infringement, the plaintiff must respond with nonspeculative evidence that such damages do, in fact, exist. See Bouchat, 346 F.3d at 522.

The district court concluded that Dash was not entitled to actual damages under § 504(b) because he had not offered "sufficient, concrete evidence to indicate an actual value of his beat." Dash, 2012 WL 1658934, at *5. On appeal, Dash argues that the Einhorn Report provided evidence of TGB's value, specifically, that Dash would have received up to $3,000 for the use of TGB if he had been paid a licensing fee for the beat. Dash, therefore, relies on his lost licensing fee as the only measure of his actual damages claim.

Under the lost licensing fee theory, actual damages are generally calculated based on "what a willing buyer would have been reasonably required to pay to a willing seller for [the] plaintiffs' work." Jarvis v. K2 Inc., 486 F.3d 526, 533 (9th Cir. 2007) (quoting Frank Music Corp., 772 F.2d at 512) (internal quotation marks omitted). "The question is not what the owner would have charged," nor what the infringer might have been willing to pay. On Davis, 246 F.3d at 166. Rather, the objective inquiry focuses on the fair market value of the work

18

as "negotiat[ed] between a willing buyer and a willing seller" contemplating the use the infringer made. Id. at 172.

We note, first, that, as the movants for summary judgment, Appellees had the initial burden to show the absence of a "genuine dispute as to any material fact and [that they] were entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Bouchat, 346 F.3d at 522. Thus, on the question of actual damages, Appellees were required to show that there was no genuine dispute among the parties as to the existence of any actual damages and, accordingly, that Appellees were entitled to judgment on Dash's actual damages claim because the record did not reveal that "a willing buyer would have been reasonably required to pay a willing seller" for the use of TGB at the WWE events. Jarvis, 486 F.3d at 533 (quoting Frank Music Corp., 772 F.2d at 512) (internal quotation marks omitted). Appellees satisfied this initial burden by providing the district court with Dash's admission that he had never commercially exploited TGB, with copies of Dash's income tax returns from 2003 to present (none of which reflect income related to the sale or licensing of any musical composition), and with Dash's failure to offer any other proof that he had previously sold one of his beats. (J.A. 944-964). Once Appellees properly made and supported their motions for summary judgment on Dash's actual damages claim, the burden shifted to

19

Dash to provide nonspeculative evidence establishing a genuine dispute as to the existence of such damages. See Bouchat, 346 F.3d at 522 (citing Matsushita Elec. Co., 475 U.S. at 586-87). Dash has failed to meet that burden.

As he did before the district court, Dash relies exclusively on the Einhorn Report's estimation of the licensing fee he might have been paid to support his actual damages claim.[7] Appellant's Br. at 21–22. Before discussing this estimation, we review those portions of the thirteen-page Einhorn Report relevant to Dash's claim.

## 1.

The Einhorn Report opened with an Introduction, which stated that Dr. Einhorn had been retained to give his "professional valuation of economic damages that resulted from the unauthorized taking of a copyrighted musical segment—[TGB]—that was originally written by the plaintiff Anthony Dash." (J.A. 1080). Importantly, this Introduction then acknowledged that "defendants Floyd Mayweather and Cory Harris co-wrote over the beat," thereby adding original lyrics to Dash's copyrighted work to produce an "infringing musical composition," "Yep,"

---

[7] Although the record contains some vague references to Dash's prior sale of musical compositions, Dash neither relied on nor provided evidence of such sales. (J.A. 157-64, 168-69, 180-82, 205-08). Therefore, we do not consider such references.

20

which was played when Mayweather appeared at both WWE events. Id. The Introduction concluded with a review 17 U.S.C. § 504(b) and the observation, in relevant part, that Dash's "actual damages include lost licensing fees or actual foregone profits suffered as a consequence of the infringement." Id.

After summarizing Dr. Einhorn's qualifications, the documents reviewed, and its ultimate conclusions, the Einhorn Report described certain "Background" information concerning the parties and the general relationship between professional wrestling and music. Id. at 1083-85. This information included references to Dash's production of musical works for various "recording artists/labels and two video games, NBA Ballers and NARC," as well as Dash's 2009 nomination for Producer of the Year at the annual South Carolina Music Awards. Id. at 1083. The Background also reviewed the characteristics of professional wrestling matches in general and the history of ring appearances by various recording artists, noting that "wrestling shows have become a very important venue for the performance and synchronization of music." Id. Following this general review, the Einhorn Report noted that the WWE employs a general manager and vice-president to operate the company's music business, including "oversee[ing] music selection, licensing, and the hiring of composers and bands." Id. at 1084. In describing this "music business," Dr. Einhorn observed that the WWE's

21

general manager regularly hires composers to create pieces of music for use at WWE events. Id. In other instances, he "will generate ring excitement and emotional value by licensing works and recordings with previous histories and audience recognition." Id. As an example of this practice, Dr. Einhorn noted that "the WWE paid the rock group Red Hot Chili Peppers a [large] sum . . . for the one time use of one of its most popular songs." Id. After describing the WWE's practice of contracting and licensing music, the Background section concluded with a discussion of Wrestlemania XXIV, both from an economic and entertainment perspective, including the match in which Mayweather participated. Id. at 1084-86. Regarding the use of "Yep," the Einhorn Report noted that the song, which Mayweather co-wrote and recorded to Dash's now-copyrighted beat, "enhanced the emotional aspect of Mayweather's ring persona and was a critical part of raising heat in the audience before the match began." Id. at 1085.

The Einhorn Report then considered Dash's actual damages claim. In so doing, Dr. Einhorn first observed that, when calculating a copyright holder's lost licensing fee, "it is appropriate to consider those song licenses that were executed for the event and select as benchmarks those uses that are most comparable to the infringing events." Id. at 1087. He continued:

> From an economic perspective, it is not appropriate simply to itemize all related music licenses and choose the average as a representative benchmark. Rather, other contracted works may vary from the song in question with regard to commercial history and present appeal. In particular, factors to be considered in selecting a benchmark include previous popularity of the work, reputation of songwriter, the presence of a released sound recording, and the possibility of a new recording in the studio.

Id. Dr. Einhorn acknowledged that "Yep" "is a new derivative work based purportedly on [TGB]," and that "[n]either Y[ep] nor [TGB] were commercial[ly] released at any previous time." Id. In summarizing his review of several WWE contracts, Dr. Einhorn noted that he had "not viewed any licenses with terms that implicate comparable musical compositions used at Wrestlemania" and that he had "also not viewed any contracts that Floyd Mayweather entered that implicate the valuation of any musical work." Id.

In estimating the value of Dash's lost licensing fee, the Einhorn Report listed four benchmark license fees paid to other artists for the use of their songs at Wrestlemania XXIV. These songs were "written prior to the event and owned independently by their songwriter or publisher." Id. at 1088. The WWE's licensing contracts gave it "all use rights related to performance and synchronization of [the] musical compositions in Wrestlemania and surrounding events." Id. "Each of the[] four songs was a previously released work that also implicated master

23

use rights for sound recordings (artists: Red Hot Chili Peppers, Snoop Dogg, Fuel, and Snoop Dogg) respectively controlled by a major record label." Id. The Einhorn Report included the specific fees paid for each of the songs. Id. The lowest was $3,000 and the highest was significantly more. Id. Based on the information provided concerning these benchmarks, the Einhorn Report acknowledged that "[f]rom a commercial perspective each composition is a more established work than" TGB. Id. Without further explanation, the Einhorn Report determined that, "[b]ased on these benchmarks, it is safe to conclude that [Dash] would have earned a maximal sum of $3,000 for the use of his musical composition." Id.

After summarily stating this maximal estimation of Dash's lost licensing fee, the Einhorn Report went on to review three contracts that the WWE had executed with artists for new songs, that is "works for hire." Id. The "music licensors" of these "new individual works included Brand New Sin, Alden, and Island Def Jam Music Group (f/s/o Saliva)." Id. The work-for-hire contracts included both flat fee and royalty agreements. Id. After listing the individual contracts, the Einhorn Report concluded its discussion of Dash's actual damages by noting that "[t]hese work-for-hire contracts involve professional recording acts that are far more established than Dash, Mayweather, or Harris," and by summarizing the artists' respective popularity

24

and success. Id. It appears that, because these artists were more established than any of the artists who contributed to "Yep," Dr. Einhorn did not consider the terms of their contracts, which were significantly higher than the maximal estimation provided for TGB, when analyzing Dash's actual damages claim. Rather, he simply concluded his discussion of Dash's claim after reviewing the artists' success, without any mention of how or whether the benchmark work-for-hire contracts factored into his analysis and without revisiting the maximal sum assigned to TGB based on the four benchmark licensing contracts he had previously reviewed.

For the reasons that follow, we find that the Einhorn Report's estimation of Dash's lost licensing fee, without more, is too speculative to show that "a reasonable jury could return a verdict" in Dash's favor on his actual damages claim, and thus, that summary judgment was appropriate. Anderson, 477 U.S. at 248.

2.

First, Dr. Einhorn's estimation of Dash's lost licensing fee failed to expressly conclude that TGB had a market value. Rather, the Einhorn Report stated only that Dash "would have earned a maximal sum of $3,000 for use of his musical composition." (J.A. 1088) (emphasis added). In summarizing this conclusion, Dr. Einhorn reiterated that "[t]he respective

25

valuation of [Dash's] missed opportunity" to earn a licensing fee was "no more than $3,000." Id. at 1082 (emphasis added).

To survive summary judgment on his actual damages claim, Dash was required to offer nonspeculative evidence that TGB had a fair market value, such that he "suffered actual damage because of the infringer[s'] failure to pay [a licensing] fee." On Davis, 246 F.3d at 166. Like any other evidence, expert testimony, such as the Einhorn Report, will not preclude summary judgment unless it raises a genuine dispute concerning a material fact. See Fed. R. Civ. P. 56(a); see also Hayes v. Douglas Dynamics, Inc., 8 F.3d 88, 92 (1st Cir. 1993). By referencing TGB's maximal value—without any actual mention of a minimum value—the Einhorn Report failed to satisfy this burden. Rather it appears to have concluded only that, to the extent TGB had a market value, such value was no more than $3,000.[8] This

---

[8] Notably absent from Dr. Einhorn's analysis is any suggestion that Dash's history as an artist or the general importance of music to the WWE supports the conclusion that TGB had a fair market value. Dr. Einhorn failed to rely on, or even cite, such propositions. Instead, he listed four benchmark fees paid for other works used at Wrestlemania XXIV before summarily concluding that Dash would have earned a maximum fee of $3,000. (J.A. 1088). The Einhorn Report's "Background" section is discussed further below. We note such omissions here only to emphasize the deficiencies in the Einhorn Report's analysis of Dash's actual damages claim.

26

conclusion does not rebut Appellees' properly supported motions for summary judgment on Dash's actual damages claim.[9]

The Einhorn Report's failure to clearly state that TGB had a fair market value is notable in light of the fact that Dr. Einhorn was retained for the express purpose of evaluating the economic damages resulting from Appellees' alleged infringement of the beat. His omission of a clear statement of value suggests that he could not conclude, either with certainty or sound reasoning, that Dash would have been paid a licensing fee for Appellees' use of TGB. However, our analysis does not end

_____

[9] The possibility that our criticism will prompt attentive plaintiffs' attorneys to require their experts to expressly state some nominal minimal value for an allegedly infringed work is, frankly, desirable. Without some express statement that a copyrighted work has a fair market value—either generally or through the assignation of a specific minimum value—defendants and courts alike are left with little to test or evaluate whether such a fair market value exists. They must, as we do here, critically evaluate the expert's report to determine whether it, in fact, opines that the work has a fair market value or whether it merely concludes, as the Einhorn Report apparently did, that, to the extent there is a market value, such value is no more than a certain sum. The necessity of this threshold inquiry into whether an expert has opined as to the fact of actual damages could easily be avoided by a clear statement that the copyrighted work has some market value. Moreover, we cannot assume that experts will automatically assign some nominal value to an evaluated work. There may be cases in which such a clear statement of value is not possible. Of course, as we note below, when such a statement is made, it will necessarily have to be evaluated to determine whether it is derived from sufficiently concrete evidence. See Waterman v. Batton, 393 F.3d 471, 478 n.8 (4th Cir. 2005) (quoting Pace v. Capobianco, 283 F.3d 1275, 1280 n.11 (11th Cir. 2002)).

with Dr. Einhorn's choice of words. Rather, we next consider whether, to the extent the Einhorn Report could be read to implicitly suggest that TGB had a fair market value, such suggestion, and the evidence upon which Dr. Einhorn relied, is sufficient to establish a genuine dispute of fact with respect to Dash's actual damages claim. We conclude that it is not.

3.

Although we have determined that the Einhorn Report failed to expressly rebut Appellees' properly supported motions for summary judgment as to Dash's actual damages claim, we note that, even if the Einhorn Report had suggested or even expressly concluded that the use of Dash's beat at WWE events was of some value to Appellees, summary judgment would still be appropriate because the evidence supporting such conclusion is overly speculative in light of the record before us and, therefore, is insufficient to establish a genuine dispute regarding Dash's actual damages claim. See Waterman v. Batton, 393 F.3d 471, 478 n.8 (4th Cir. 2005) ("Opinion evidence is only as good as the facts upon which it is based." (quoting Pace v. Capobianco, 283 F.3d 1275, 1280 n.11 (11th Cir. 2002) (internal quotation marks omitted)).

a.

Under the lost licensing fee theory relied upon by Dash, evidence of a copyright holder's prior licensing or valuation of

28

his work can provide sufficient support for his actual damages claim. See, e.g., Polar Bear Prods., 384 F.3d at 709 (affirming an actual damages award based on the copyright holder's actual price quote to the infringer). Here, Dash has failed to present any evidence—such as an affidavit or a prior contract—that he had ever sold, offered for sale, or licensed one of his beats to Appellees or anyone else. See Dash, 2012 WL 1658934, at *4. Instead, he offers only the Einhorn Report, which relies solely on those fees paid to other artists whose works were used at Wrestlemania XXIV.

Although the Einhorn Report did not rely on Dash's history as a musical artist when evaluating his actual damages claim, we note that the Background section did briefly reference this history. (J.A. 1083). Specifically, Dr. Einhorn stated that "Dash is a young music producer" who "has produced musical works for a number of recording artists/labels and two video games, NBA Ballers and NARC." Id. Dr. Einhorn continued, "For his professional efforts as a music creative, Mr. Dash was nominated in 2009 for Producer of the Year at the annual South Carolina Music Awards." Id. These brief statements, without more, are too speculative to create a genuine dispute as to Dash's entitlement to actual damages.

To survive summary judgment of an actual damages claim, a copyright holder "must show that the thing taken had a fair

29

market value." On Davis, 246 F.3d at 166. Evidence of the owner's prior sale or licensing of copyrighted work will satisfy this burden when it is "sufficiently concrete." Id. at 161. For instance, in On Davis, the Second Circuit held that the plaintiff's testimony that "numerous rock stars" had worn his copyrighted eyewear in published photographs and, "that on one occasion he was paid a royalty of $50 for the publication by Vibe magazine of" such a photo, was "sufficiently concrete to support a finding of fair market value of $50 for the type of use made by Vibe." Id.; see also Jarvis, 486 F.3d at 534 (finding sufficiently concrete evidence to support an actual damages award when the record included expert testimony as to the specific value of each image and evidence of Jarvis' prior compensation for use of the images). The value of Davis' testimony concerning his prior royalty fee was not that it established a reasonable amount of damages, but rather that it provided concrete evidence that Davis would have received a royalty from The Gap for the use of his copyrighted eyewear in its advertisement. Stated differently, Davis' prior royalty showed that his copyrighted works generally had fair market value when used in printed advertisements, sufficient to support a finding that the specific, infringed work, in fact, had such value when similarly used. Neither Dr. Einhorn nor Dash has provided any evidence that Dash ever received compensation for

30

his prior productions. Unlike in On Davis, there is simply no concrete evidence concerning Dash's past compensation for use of his musical works.

The record also fails to establish that the productions referenced in the Einhorn Report occurred prior to Appellees' alleged infringement of TGB. Specifically, TGB was composed in 2005 and allegedly infringed in 2008 and 2009. The Einhorn Report was authored on October 4, 2011. (J.A. 1079). To show that Dash's prior productions establish that he would have earned a licensing fee for Appellees' use of TGB in 2008 and 2009, the Einhorn Report should have, at a minimum, demonstrated that some of those productions occurred before the alleged infringement.[10] Not only did the Einhorn Report fail to show that Dash was ever compensated for his prior works, it also failed to establish that such works predated the alleged infringement.[11] Without any evidence that Dash previously sold

---

[10] Dr. Einhorn did refer to Dash's nomination for Producer of the Year in 2009. (J.A. 1083). However, it is not clear from the record whether this nomination occurred before or after the August 24, 2009, RAW broadcast, the second and final instance of alleged infringement at issue. Additionally, although the Einhorn Report referenced two specific video games for which Dash produced musical works, it failed to provide any information concerning those games, such as their release dates.

[11] We note, again, that Dash's deposition testimony contains some vague references to the dates of his prior productions and the fact that he may have received some compensation for such productions. (J.A. 157-64, 168-69, 180-82, 205-08). However, (Continued)

31

or otherwise garnered some market value for the use of his music, any claim that he would have earned a licensing fee, based solely on his history as an artist, is too speculative to preclude summary judgment on his actual damages claim. Indeed, the Einhorn Report seems to implicitly accept this proposition, based on its conclusion that Dash's lost licensing fee should be determined through an analysis of the licensing fees that the WWE paid to other artists for use of their works at Wrestlemania XXIV and not through an analysis or discussion of Dash's own compositions. Id. at 1087.

b.

Although evidence of a copyright holder's own prior sale or licensing of copyrighted work can support the existence of actual damages under § 504(b), such evidence is not required to defeat a motion for summary judgment. Otherwise, first-time copyright owners would never be able to overcome summary judgment of an actual damages claim. Rather, evidence of an owner's prior sales is but one way of measuring "what a willing

Dash was unable to recall any details and failed to supplement (or even offer to supplement) the record with concrete evidence of the same. Accordingly, we find that these vague approximations, to the extent they could be relied on to support the conclusion that TGB had a fair market value, are too speculative to rebut Appellees' properly supported motions for summary judgment.

buyer would have been reasonably required to pay a willing seller" for the use that the infringer made. Jarvis, 486 F.3d at 533 (quoting Frank Music Corp., 772 F.2d at 512) (internal quotation marks omitted). Evidence of licensing fees paid to other artists for the use of other works may, in some cases, be sufficient to support the conclusion that a copyright holder would have been entitled to such a fee for the use of his work; however, such evidence may properly be rejected as a measure of damages if it is too speculative. See Frank Music Corp., 772 F.2d at 513.

Evidence of an infringer's entrance into licensing agreements with other copyright holders is not overly speculative when the benchmark licenses contemplate "comparable uses of comparable works." Real View, LLC v. 20-20 Techs., Inc., 811 F. Supp. 2d 553, 557 (D. Mass. 2011) (quoting Oracle USA, Inc. v. SAP AP, No. 07-1658, 2011 WL 3862074, at *7 (N.D. Cal. Sept. 1, 2011)) (internal quotation marks omitted); see also McRoberts Software, Inc. v. Media 100, Inc., 329 F.3d 557, 566-67 (7th Cir. 2003) (rejecting a defendant's allegation that a lost licensing fee award was based on undue speculation in light of evidence that included proof of comparable software deals made by the defendant). But, if the benchmarks relied on are inapposite, they may, without more, be too speculative to support a copyright holder's claim for actual damages. See

33

*Country Rd. Music, Inc. v. MP3.com, Inc.*, 279 F. Supp. 2d 325, 331 (S.D.N.Y. 2003) (collecting cases recognizing the error of beginning with benchmark licenses for works or uses different from that made by the infringer).

Here, the district court concluded that Dash's evidence of the fees that the WWE paid to well-known artists at Wrestlemania XXIV was irrelevant and overly speculative because such artists were not similarly situated to Dash. *Dash*, 2012 WL 1658934, at *5. We agree that Dash's evidence is too speculative to support his actual damages claim because it relies solely, and without explanation, on the licensing fees paid for works that were not comparable to TGB.

In calculating Dash's actual damages, Dr. Einhorn conceded that he had "not viewed any licenses or terms that implicate comparable musical compositions used at Wrestlemania" and that he had "also not viewed any contracts that Floyd Mayweather entered that implicate the valuation of any musical work." (J.A. 1087) (emphases added). Indeed, Dr. Einhorn not only expressly conceded that he had not analyzed comparable works, he also emphasized the differences between "Yep" and the selected benchmarks under the identified "factors to be considered in

34

selecting a benchmark."[12]  Id.  Specifically, Dr. Einhorn observed that "[n]either Y[ep] nor [TGB] were commercial[ly] released at any previous time," whereas each of the four benchmarks "was a previously released work that also implicated master use rights for sound recordings . . . controlled by a major record label."  Id. at 1087-88.  Based on these differences, Dr. Einhorn concluded that, "[f]rom a commercial perspective, each composition is a more established work than [TGB]."[13]  Id. at 1088.  Thus, the four benchmarks used to

---

[12] These factors, which were based on "commercial history and present appeal," included "previous popularity of the work, reputation of the songwriter, the presence of a released sound recording, and the possibility of a new recording in the studio." (J.A. 1087).

[13] Although Dr. Einhorn did not refer to any information described in the report's Background section when considering Dash's actual damages, we observe that his description of the WWE's licensing practices and his reference to the highest listed benchmark further emphasize the disparity between TGB and the benchmark licenses.  Specifically, Dr. Einhorn noted that, in addition to hiring composers to create new works for WWE events, the WWE would "licens[e] works and recordings with previous histories and audience recognition." (J.A. 1084).  As "a new derivative work," "Yep" carried no such history or recognition and Dr. Einhorn failed to explain why, under such circumstances, Dash would have earned a licensing fee for Appellees' use of his beat in the song.  Id. at 1087. Additionally, when describing the type of songs generally licensed by the WWE, Dr. Einhorn noted that "the WWE paid the rock group Red Hot Chili Peppers a [large] sum . . . for the one time use of one of its most popular songs," apparently referring to the first benchmark.  Id. at 1084, 1088.  Again, as a "new derivative work" from new artists, id. at 1087, "Yep" was not at all comparable to "one of [the] most popular songs" of a well-known band, such as the Red Hot Chili Peppers, id. at 1084.  Dr. (Continued)

35

estimate Dash's lost licensing fee were inapposite and, <u>without more</u>, are too speculative to preclude summary judgment of Dash's actual damages claim. <u>See</u> <u>Country Rd. Music</u>, 279 F. Supp. 2d at 331.

This is not to say that a copyright holder must always rely on precisely comparable works to defeat a properly supported motion for summary judgment of his actual damages claim. Indeed, it may be difficult or impossible for a first-timer, such as Dash, to identify such works. Accordingly, so long as a copyright holder's entitlement to lost licensing fees is not based on "undue speculation," § 504(b) does not require summary judgment of such a claim simply because it is based on non-comparable benchmarks. <u>See</u> <u>On Davis</u>, 246 F.3d at 164 (recommending that the term "actual damages . . . be broadly construed to favor victims of infringement"). However, while a copyright holder may rely on benchmarks that are not comparable to the allegedly infringed work, he may not rely solely on such benchmarks. <u>See</u> <u>Country Rd. Music</u>, 279 F. Supp. 2d at 331. To survive summary judgment, he must, at a minimum, demonstrate <u>how</u> the cited noncomparable benchmarks compel the conclusion that he would have earned a licensing fee absent infringement. That is,

Einhorn failed to explain how the differences between TGB and the benchmarks used affected his analysis.

36

he must demonstrate that, despite the differences between the benchmarks and his work, such benchmarks create a genuine dispute of fact as to his actual damages claim. See Fed. R. Civ. P. 56(a); see also Bouchat, 346 F.3d at 522 (citing Matsushita, 475 U.S. at 586-87). An expert affidavit, such as the Einhorn Report, can satisfy this burden, if it describes both "the factual basis and the process of reasoning which makes the conclusion viable." Hayes, 8 F.3d at 92. An expert affidavit lacking such explanation will be insufficient to rebut a properly supported motion for summary judgment. Id. ("[A] bare ultimate expert conclusion [is not] a free pass to trial every time that a conflict of fact is based on expert testimony.").

Here, the Einhorn Report detailed several facts, including the four benchmark licenses used to estimate Dash's lost licensing fee. But the report failed to include any description of the "process of reasoning" used to determine that Dash "would have earned a maximal sum of $3,000 for use of his musical composition." (J.A. 1088). Instead, Dr. Einhorn cited four admittedly inapposite benchmarks before summarily concluding that the lowest of such benchmarks was an appropriate maximal value of the licensing fee Dash could have earned for the

37

Appellees' use of TGB.[14]  Id.  Without at least some explanation of the process by which TGB's estimated maximal value was determined, the Einhorn Report's perfunctory conclusion is too speculative to rebut Appellees' properly supported motions for summary judgment, because that conclusion is based only and without explanation on the fees paid to well-established artists for the use of their works at Wrestlemania XXIV.

   To aid plaintiffs and their experts going forward, we note the many deficiencies in the Einhorn Report that compel this conclusion.  First, although the Einhorn Report acknowledged that "it [would] not be appropriate simply to itemize all related music licenses and choose the average as a representative benchmark," it failed to explain how Dr. Einhorn selected the four benchmarks licenses cited to support his estimation of TGB's maximal value.  Id. at 1087.  While the report stated that certain factors should be used to determine the most comparable benchmark works, it failed to describe how such factors recommended selection of the specific benchmarks.

_____

   [14] We note that Dr. Einhorn did not expressly state that the lowest benchmark was the appropriate maximal value of TGB. Rather, he simply stated that, "Based on the[] benchmarks, it is safe to conclude that [the] plaintiff would have earned a maximal sum of $3,000 for use of his musical composition." (J.A. 1088).  We infer this connection from the fees listed and the estimation provided, but Dr. Einhorn failed to explain his estimation in such terms.

38

Id. at 1088. Dr. Einhorn noted that such benchmarks were identified "[b]ased on [his] review of available information of songs used at Wrestlemania XXIV," but he failed to further explain why such clearly inapposite benchmarks were selected and whether he had reviewed any other licensing agreements when determining the appropriate benchmarks. Id.

Second, although the Einhorn Report acknowledged the differences between TGB and the selected benchmarks, it failed to indicate whether and to what extent Dr. Einhorn had considered such differences when estimating TGB's maximal value. For example, the report did not explain how the differences in audience recognition and release history factored into the analysis. Nor did Dr. Einhorn try to bridge the gap between the "more established" artists and Dash by, for instance, drawing on his expertise and experience in the industry to explain, even in general terms, the difference between what a well-established artist and a first-timer typically earn for similar uses of their copyrighted work. In light of Dr. Einhorn's impressive "Statement of Qualifications," such explanation would not have been unfounded or overreaching; rather, it would have provided some support for any conclusion that Dash would have earned a licensing fee because well-established artists had earned such fees at Wrestlemania XXIV.

39

The Einhorn Report's failure to address the differences between TGB and the benchmark licensing fees is compounded by the subsequent analysis of the benchmark work-for-hire contracts, in which Dr. Einhorn apparently concluded that, because such contracts "involve[d] professional recording acts that are far more established than Dash, Mayweather, or Harris," they should not factor into the estimation of Dash's lost licensing fee. Id. at 1088. Thus, in a single page of his report, Dr. Einhorn both relied on and dismissed benchmark licenses by more established artists, without explaining why such disparate approaches to the various contracts were appropriate.

Third, and perhaps most importantly, although the Einhorn Report acknowledged that "Yep" was "a new derivative work based purportedly on [TGB]," it failed to explain at all how this fact impacted the analysis of Dash's actual damages claim. Id. at 1087. That is, Dr. Einhorn listed fees that the WWE paid to use completed works at Wrestlemania XXIV without any mention of the fact that TGB formed but one part of "Yep," "[t]he song [that allegedly] enhanced the emotional impact of Mayweather's ring persona" and was, therefore, "a critical part of raising heat in the audience before the match began." Id. at 1085. Dr. Einhorn simply failed to discuss the fact that the lyrics, which were co-written by Mayweather and Cory Harris, added original, non-

40

infringing content to the entrance song. To the extent Dr. Einhorn concluded that "Yep" had value, he failed to conclude that TGB contributed to any such value.

In discussing the Einhorn Report's deficiencies, we do not mean at all to suggest that an expert opinion based on works by more established artists could never support an actual damages claim at summary judgment. Rather, in this case, the Einhorn Report's summary comparison of TGB to such works is insufficient, given that the benchmarks are not comparable to TGB and that Dr. Einhorn failed to explain how the differences between the benchmarks used and Dash's beat factored into his analysis of Dash's actual damages claim.

c.

Before concluding our discussion of actual damages, we wish to address certain points raised in the Background section of Dr. Einhorn's report regarding the importance of music in WWE events and Dash's reputation as an artist. These facts, when considered with the WWE's payment of other licensing fees at Wrestlemania XXIV, could arguably be interpreted as evidence that TGB had some value, although we note that Dr. Einhorn did not cite to or rely on any of the facts set forth in the Background section when analyzing Dash's actual damages claim. More importantly, those facts are not sufficient to rebut a properly supported motion for summary judgment, even when

41

considered with Dr. Einhorn's summary comparison of TGB to the listed benchmarks.

As discussed above, Dr. Einhorn's brief reference to Dash's reputation as an artist did not establish that Dash had ever been compensated for the use of his musical compositions. Additionally, nothing in Dr. Einhorn's description of Dash's reputation indicated that this reputation predated the alleged infringement, such that Dash's history as a musical artist might be sufficient to conclude that he would have earned a licensing fee for Appellees' use of TGB. Thus, nothing in Dr. Einhorn's brief review of Dash's history as an artist creates a genuine dispute as to his actual damages claim, in light of Appellees' evidence that Dash has never received revenue from TGB or any other musical composition.

Nor is the fact that music, in general, has value to the WWE sufficient to show that Dash's beat, in particular, had such value. Under such reasoning, any piece of music, regardless of its quality or reputation, would necessarily have a fair market value to Appellees. Were such evidence sufficient to rebut a properly supported motion for summary judgment, a copyright holder would need to show only that the infringer generally values the type of copyrighted material infringed, without any evidence that the specific work had a fair market value. Such a result is untenable and contrary to the well-established

42

principles regarding actual damages under § 504(b). While the term "actual damages" should be "broadly construed to favor victims of infringement," a copyright holder "must show that the thing taken had a fair market value." On Davis, 246 F.3d at 164, 166 (emphasis added). That some music has value to the WWE, even great value, is not enough to establish that TGB had a fair market value.

Moreover, the Einhorn Report itself fails to support such a conclusion. When reviewing the importance of entrance music to professional wrestling generally, and to the WWE specifically, Dr. Einhorn incorporated deposition testimony that "a music selection 'makes [a WWE] product better, assuming it's a good piece of music.'" (J.A. 1084) (emphasis added) (quoting Lawi Dep. 105, Sept. 2011). He further acknowledged that the WWE generally pays licensing fees to artists for the use of works with certain characteristics, that is, "works and recordings with previous histories and audience recognition." Id. Thus, although music may play an important role in "raising heat" at professional wrestling events, the record before us fails to indicate that all music plays such a role. Accordingly, the general importance of some music to the WWE is not enough to establish that Appellees' would have paid Dash a licensing fee to use TGB as a component of "Yep." Id. at 1085.

43

Although Dash relies on the district court's reasoning in Wood v. Houghton Mifflin Harcourt Publishing, Co., 589 F. Supp. 2d 1230 (D. Colo. 2008), to support his claim for profit damages under § 504(b), we note that this case could, at first blush, be read to suggest that an infringer's payment for use of any copyrighted work of a particular type establishes that he would pay to use all works of that type. Id. at 1246. However, we do not read Wood so broadly. In that case, Houghton Mifflin Harcourt ("HMH") had purchased six licenses to use nine of Ted Wood's ("Wood") photographs in two textbook series and an educational periodical. Id. at 1235. Under the terms of these licenses, HMH agreed "to publish no more than 40,000 copies of the textbook or magazine in which [the] copyrighted photographs were to appear." Id. In his copyright infringement action, Wood alleged that HMH had printed more than 40,000 copies of the textbooks and periodicals and that HMH "committed an additional infringement of his copyright . . . when it re-published several of [Wood's] photos . . . without securing a license to do so." Id. Among the many arguments that HMH raised in its defense was the claim that "because it licensed photographs from Wood, rather than textual materials, his copyrighted material added no value . . . to the language arts textbooks and periodicals." Id. at 1246. The district court rejected this argument, noting that "the very fact that the publisher pays fees for photographs

44

to be used in language arts textbooks and periodicals illustrates that those photographs have value to HMH as it creates and markets textbooks." Id. (emphasis in original). Although the district court's broad statement, out of context, could be read to support the proposition that an infringer's payment for the use of any copyrighted work of a given type is sufficient to show that the infringer would have been reasonably required to pay a fee to use a specific work of that type, the facts of the case speak differently. There, unlike here, the infringer had executed a number of licensing agreements with the copyright holder. Such agreements provided concrete evidence that Wood would have earned a licensing fee for HMH's excess uses of his copyrighted photographs. We cannot adopt statements made in this context to conclude that payment of any licensing fee for a general type of copyrighted work is sufficient to show that all works of that type would garner such a fee, absent any other evidence that the allegedly infringed work had a fair market value.

Likewise, the fact that Appellees used "Yep," which included TGB, is not enough to show that Dash's beat had fair market value. Allowing the "fact of use" alone to rebut a properly supported motion for summary judgment would entirely eliminate the copyright holder's obligation to show that his work had a fair market value, a requirement designed to combat

45

the risk of abuse inherent in recognizing a plaintiff's lost licensing fee as a measure of § 504(b) actual damages. On Davis, 246 F.3d at 166. In the face of overwhelming evidence that his work lacked fair market value, the plaintiff would need only to reiterate his initial complaint—that the defendant used his work without his permission—to survive summary judgment. This result is almost certainly not what our sister circuits had in mind when they recognized lost licensing fees as a measure of actual damages under § 504(b). Such an approach would preclude a § 504(b) actual damages claim from ever being decided on summary judgment, no matter how speculative or deficient the copyright holder's evidence concerning his work's fair market value. This outcome not only obviates the requirement that a copyright holder show that the infringed work had a fair market value, it also runs contrary to the well-established principles governing summary judgment under Federal Rule of Civil Procedure 56. See Glynn v. EDO Corp., 710 F.3d 209, 216 (4th Cir. 2013) ("'[C]onclusory allegations and speculative assertions . . . without further legitimate support clearly do[] not suffice' to create a genuine issue of material fact." (quoting Guinness PLC v. Ward, 955 F.2d 875, 901 (4th Cir. 1992))).

Thus, none of the facts recited in the Background section of the Einhorn Report is sufficient to show that Dash would have earned a licensing fee for Appellees' use of TGB, and,

46

accordingly, none is sufficient to rebut Appellees' properly supported motions for summary judgment. Nor do these facts, taken together, create a genuine dispute for trial. Although we draw all reasonable inferences in favor of the nonmoving party, "[a] party 'cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another.'" Stone, 105 F.3d at 191 (quoting Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985)) (internal quotation marks omitted). Rather, the nonmoving party must show that a reasonable jury could return a verdict in his favor on each element necessary to his claim—including damages. Banca Cremi, 132 F.3d at 1027.

Taken as a whole, the Einhorn Report demonstrated that 1) certain music plays an important role in professional wrestling matches; 2) the WWE recognizes the value of such music through its operation of an in-house music business; 3) the WWE played a song that included Dash's now-copyrighted beat at two events, Wrestlemania XXIV and the August 24, 2009, RAW broadcast; 4) the WWE paid four well-established artists licensing fees for use of their recognizable works at Wrestlemania XXIV; and 5) sometime prior to 2011, Dash received some recognition (but no compensation) for his work as a musical artist. We would be building inference upon inference to conclude that these facts were sufficient to rebut Appellees'

evidence that Dash's musical works—including and especially TGB—do not have a fair market value. The importance of music to the WWE, and its payment for use of music from well-established artists, does nothing to compel the conclusion that Dash would have received a licensing fee for TGB. And Dash's sparse and unspecified history as a musical artist does not require a different result.

There are ways new artists such as Dash can establish the existence of actual damages. Dash could have submitted an affidavit regarding any prior sale, license, or valuation of his musical compositions. Dr. Einhorn could have provided some minimal explanation of the process by which he determined TGB's estimated maximal value from the four inapposite benchmarks cited. Without such evidence, any implicit suggestion that Dash could have earned a licensing fee for Appellees' use of TGB simply because well-established artists earned licensing fees for the use of their works by the WWE is too speculative to support Dash's actual damages claim. "[T]here is simply too great an analytical gap between the [benchmarks] and the opinion offered" to rebut Appellees' properly supported motions for summary judgment. Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997) (discussing the sufficiency of an expert's opinion in the context of its admissibility under Federal Rule of Evidence 702 and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579

(1993)); see also Country Rd. Music, 279 F. Supp. 2d at 331 (applying Joiner to an actual damages claim under § 504(b)).

"Although uncertainty as to the amount of damages will not preclude recovery, uncertainty as to the fact of damages may" and, in this case, does because the only evidence supporting the existence of actual damages is overly speculative.[15] Frank Music Corp., 772 F.2d at 513. To the extent any uncertainty as to the amount of such damages may exist, this question is not before us in light of Dash's failure to present sufficiently concrete evidence as to the existence of any actual damages under § 504(b).[16] Accordingly, we affirm the district court's grant of summary judgment as to Dash's actual damages claim.

---

[15] Indeed, while it is generally the wrongdoer who must assume the risk of some uncertainty with respect to the damages he has caused, this presumption applies only if the fact of damage is established. See Mid-Am. Tablewares, Inc. v. Mogi Trading Co., 100 F.3d 1353, 1367 (7th Cir. 1996) (quoting Robert L. Dunn, Recovery of Damages for Lost Profits § 1.3 at 11) ("If plaintiff's proof leaves uncertain whether plaintiff would have made any profits at all, there can be no recovery.").

[16] Dash has argued that the district court improperly considered whether the Einhorn Report presented sufficient evidence as to the amount of actual damages he suffered as a result of the alleged infringement. Appellant's Br. at 21-22. However, the district court concluded, as we do, that Dash "relie[d] only on speculation, while [Appellees] have offered evidence that indicates that [Dash's] song did not have a market value." Dash, 2012 WL 1658934, at *5 (emphasis added). Accordingly, Dash incorrectly characterizes the district court's ruling, which concerned the fact and not the amount of actual damages. See Frank Music Corp., 772 F.2d at 513. As stated above, the amount of any actual damages is not before us. (Continued)

Having concluded that Dash failed to establish his entitlement to actual damages, we now address his claim for profit damages. The district court granted Appellees summary judgment on this claim because it found that Dash had failed to present evidence that Appellees' revenues bore any causal link to the infringement. We affirm.

1.

As stated above, the Copyright Act provides for the award of profit damages as follows:

> The copyright owner is entitled to recover . . . any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages. In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work.

17 U.S.C. § 504(b). The statute's "simplicity masks fiendish difficulties concerning the calculation of" these amounts in

---

However, we do note, as a practical concern, that it would be difficult for a defendant to properly test or defend against Dr. Einhorn's report without at least some discussion of how the selected benchmarks establish that Dash is entitled to actual damages. Cf. Stevens Linen Assocs., 656 F.2d at 14 (affirming the district court's rejection of projected sales as a measure of compensatory damages when there was "no basis on which the court could evaluate the validity of the projections").

light of the numerous variables at issue in copyright law. Walker, 28 F.3d at 412. Therefore, a summary of our jurisprudence on this issue follows.

a.

In Walker v. Forbes, Inc., we dealt with the question of the amount of profit damages to which a plaintiff is entitled when the infringing content forms only one component of the defendant's product. In that case, the defendant used a photograph taken by the plaintiff in one of its magazine articles. Id. at 411. The plaintiff sued, demanding the revenue that magazine issue had generated for the defendants. Id. Following a jury trial, the plaintiff was awarded three thirty-fifths of one percent of the claimed revenues. Id. at 410-11. The plaintiff appealed. Id. at 410. In upholding the award, we noted that, when "the infringement occurs as a small part of a much larger work, the fact finder properly focuses not on the profit of the work overall, but only on the profit that the infringement contributes." Id. at 415. "While [the defendant] made substantial sums from [the] issue, if only a small part of that amount can be attributed to the use of [the plaintiff's] photo, . . . then only a small part is his reward." Id.

b.

We expounded on this rule nine years later in Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514 (4th Cir. 2003).  In Bouchat, the defendants used the plaintiff's "Flying B" symbol as the logo of the Baltimore Ravens football team. Id. at 516–17.  The plaintiff sought profit damages from a wide variety of revenue streams ranging from stadium parking to video games.  Id. at 517–18.  The district court first granted the defendants partial summary judgment as to all revenue sources except the "sales of merchandise bearing the Flying B logo" and "royalties obtained from licensees who sold such merchandise." Id.  The district court later granted the defendants partial summary judgment with respect to the revenues from minimum guarantee shortfalls, free merchandise, trading cards, video games, and game programs.  Id.  At trial, the jury found by a preponderance of the evidence that the merchandise sales remaining after summary judgment were wholly attributable to factors other than the infringing logo, and denied the plaintiff's claim for profit damages.  Id. at 519.  The plaintiff appealed.  Id.

In deciding the appeal, we discussed two methods by which a defendant can argue that summary judgment is appropriate as to all or some of a plaintiff's profit damages.  First, a defendant can argue that the plaintiff has not met his initial statutory

52

burden of "present[ing] proof . . . of the infringer's gross revenue." 17 U.S.C. § 504(b). Following the precedent of our sister circuits, we further held that this "gross revenue" that plaintiffs are obligated to prove "'means gross revenue reasonably related to the infringement, not unrelated revenues.'" Bouchat, 346 F.3d at 520–21 (quoting On Davis, 246 F.3d at 160) (citing Mackie, 296 F.3d at 912–16; Univ. of Colo. Found., Inc. v. Am. Cyanamid Co., 196 F.3d 1366, 1375 (Fed. Cir. 1999); Taylor v. Meirick, 712 F.2d 1112, 1122 (7th Cir. 1983) ("If General Motors were to steal your copyright and put it in a sales brochure, you could not just put a copy of General Motors' corporate income tax return in the record and rest your case for an award of infringer's profits.")). Therefore, we held that, in order to meet his initial burden under § 504(b), a plaintiff must not merely present proof of the amount of the claimed revenue streams, but must also provide "more than mere speculation as to the existence of a causal link between the infringement and the claimed revenues." Bouchat, 346 F.3d at 521. If the plaintiff fails to make this showing, summary judgment is appropriate.

Second, we noted that, even if the plaintiff meets his statutory burden of showing proof of the infringer's gross revenues as described above, summary judgment is appropriate if a defendant is able "to prove his or her deductible expenses and

53

the elements of profit attributable to factors other than the copyrighted work." 17 U.S.C. § 504(b). Although the statutory burden of proof on the issue of attributability rests with the defendant, this presents "no obstacle to a summary judgment award in favor of that party, so long as the requirements of Rule 56 are otherwise satisfied." Bouchat, 346 F.3d at 521–22. In order to prevail in this manner, the defendant must present evidence that all of the claimed profits are "attributable to factors other than the copyrighted work." 17 U.S.C. § 504(b). If the defendant's evidence is sufficient to "demonstrat[e] the absence of a genuine issue of material fact," the plaintiff must "bring forth facts showing that 'reasonable minds could differ' on a material point." Bouchat, 346 F.3d at 522 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986)). If the plaintiff's evidence that the claimed revenues are attributable to the infringement is unduly speculative, "merely colorable," or "not significantly probative," summary judgment can be granted to the defendant notwithstanding the fact that the defendant bore the statutory burden of proof. Id. (citing Anderson, 477 U.S. at 249).

Therefore, we concluded in Bouchat that granting a defendant summary judgment on a revenue stream is proper under two circumstances. First, summary judgment is appropriate if the plaintiff fails to meet his initial burden of proving the

54

infringer's gross revenues because "either (1) there exists no conceivable connection between the infringement and those revenues; or (2) despite the existence of a conceivable connection, [the plaintiff has] offered only speculation as to the existence of a causal link between the infringement and the revenues." Id. at 522–23. If the plaintiff fails to show such a conceivable connection or causal link, then he fails to show that the claimed revenues are reasonably related to the infringement. Second, even after the statutory burden has shifted to the defendants, summary judgment may be granted if the defendants file "a properly supported motion for summary judgment" showing that the claimed revenues are attributable entirely to factors other than the infringement, and the plaintiff fails to respond with evidence that can raise a genuine dispute as to the issue. Id. at 524.

In Bouchat, we held that the granting of summary judgment with respect to "the revenues from minimum guarantee shortfalls and free merchandise" was proper because those revenues, which were based on licensing agreements that predated the infringement, "lack[ed] all conceivable connection" to the infringement. Id. at 524. With respect to the remaining revenue streams on which summary judgment had been granted, we held that summary judgment was proper "despite the existence of a conceivable connection between the infringement and the level

55

of revenue that the [d]efendants earned from these sources." Id. Although it was theoretically conceivable that the revenue streams were connected to the infringement, the plaintiff had "offered only speculative evidence of a causal link between the infringement and the level of the revenues." Id.; see also id. at 525 n.10 ("[I]t defies credulity that a consumer would purchase NFL trading cards in order to catch a glimpse of the Flying B logo on a featured player's helmet; or video games, so as to see the logo on the simulated Ravens players; or a game program, simply because its artwork incorporated the Flying B."). Therefore, the plaintiff had failed to prove the defendants' gross revenues reasonably related to the infringement. We further held that summary judgment as to these revenues was also proper because the defendants had proven that the claimed revenues were entirely attributable to factors other than the infringement, and the plaintiff had failed to submit evidence in rebuttal as required under Rule 56. Id. at 524-25.

Because the plaintiff had failed to prove the defendants' gross revenues reasonably related to the infringement, and because the defendants' motion for summary judgment proved that the claimed revenues were not attributable to the infringement, we upheld the district court's grant of summary judgment.

We revisited the question of the reasonable relationship required between gross revenues and infringement two years later in Bonner v. Dawson, 404 F.3d 290, 294 (4th Cir. 2005). In Bonner, the defendants erected and leased a building that infringed on the plaintiff's architectural copyright. Id. at 292. The plaintiff demanded all of the lease revenues as profit damages. Id. After the jury found for the defendants on this issue, the plaintiff moved for judgment as a matter of law. Id. at 293. The district court denied this motion, holding that the plaintiff "had the burden of showing a causal link between the infringement and the profits incurred, a link that the jury could have reasonably determined he had not shown." Id. In denying the motion for judgment as a matter of law, the district court also held that a reasonable factfinder could find that the defendants had "show[n] that the profits were derived from sources other than the infringement." Id.

The plaintiff appealed the district court's denial of his motion for judgment as a matter of law, and we confirmed that a copyright plaintiff "has the burden of demonstrating some causal link between the infringement and [a] particular profit stream before the burden-shifting provisions of § 504(b) apply." Id. at 294 (citing Bouchat, 346 F.3d at 521). However, we rejected the district court's conclusion that, in order to show a causal

link, the plaintiff was required to demonstrate "that the basis for the profits was the particularized design of the building." Id. Instead, we held that it was sufficient that the plaintiff had "produced evidence of the profits generated by the leasing agreements in the infringed building" because "[t]his amount was derived exclusively from the infringed building; no other source contributed to the generated funds." Id. Accordingly, we found that the plaintiff had met his initial burden under Bouchat of showing some causal link between the infringement and the claimed profit stream. Id. Despite this ruling, we affirmed the district court's judgment because the jury reasonably could have found that all of the claimed revenues were attributable to factors other than the infringement. Id. at 295.

The building in Bonner was distinguishable from the merchandise in Bouchat. In Bouchat, the causal link between the infringement and the profits alleged by the plaintiff required the jury to find that a football team's adoption of one logo design over another would cause consumers to purchase game programs, trading cards, or video games simply to see the infringing logo. Bouchat, 346 F.3d at 525 n.10. Although there was a "conceivable connection" between the infringement and the claimed sales of merchandise containing the Flying B logo, any causal link between the two was so unlikely as to "def[y] credulity." Id. Because the plaintiff had provided no evidence

58

that could persuade a reasonable jury that a causal link existed between the infringement and the merchandise sales, and also because the defendants had presented uncontested evidence proving that all of the claimed revenues were attributable to other factors, we held that summary judgment for defendants was proper. Id. at 525 & n.10.

In contrast, the plaintiff in Bonner had presented evidence that the claimed revenues were derived solely from a building that infringed the plaintiff's architectural designs. Bonner, 404 F.3d at 294. This was sufficient to prove some causal link between the infringement of the designs and the revenues from the building based on those designs, even if further evidence showed that the infringed designs did not actually increase the building's revenues. See id.

### d.

In summation, whether at the summary judgment stage or at trial, a plaintiff seeking profit damages has an affirmative duty to prove the defendant's "'gross revenue reasonably related to the infringement.'" Bouchat, 346 F.3d at 520–21 (quoting On Davis, 246 F.3d at 160). This requires the plaintiff to prove (1) the amount of the claimed revenue streams, and (2) that there is some reasonable relationship "between the infringement and th[ose] particular profit stream[s]." Bonner, 404 F.3d at 294. Proving that the claimed profit streams are reasonably

59

related to the infringement requires the plaintiff to (1) allege a "conceivable connection" between the infringement and the claimed revenues, and (2) offer nonspeculative evidence that a causal link exists. Bouchat, 346 F.3d at 522-23.

The first step, alleging a conceivable connection, is not an exacting standard. A proffered connection will be considered "conceivable" even if it is highly unlikely that the infringement actually contributed to the claimed revenues. See id. at 525 & n.10 (finding that a conceivable connection existed between the infringement of the plaintiff's logo and the defendants' sale of trading cards, video games, and football game programs even though it "defies credulity that a consumer would purchase" such products out of a desire to see an infringing logo featured therein). However, in order for a conceivable connection to exist, the connection between the infringement and the revenues must be "at least hypothetically possible." See id. at 524 (holding that the infringement was not conceivably connected to revenues which the defendants were entitled to receive via contracts that they had entered into prior to the infringement).

After the plaintiff has alleged a conceivable connection between the infringement and the claimed revenues, his task is not yet done. The plaintiff must also prove the existence of a "causal link between the infringement and the level of the

[defendant's] revenues." Id. at 524–25. Once he has done so, the burden then shifts to the defendant to prove that those revenues are not actually attributable to the infringing aspects of the work. See Bonner, 404 F.3d at 294–95.

In the summary judgment context, a defendant can challenge the relationship between the claimed revenues and the infringement in any or all of three ways. First, the defendant can argue that the plaintiff cannot state a conceivable connection between the infringement and the claimed revenues. The plaintiff must respond to this challenge by arguing that some such connection exists. A defendant will be granted summary judgment on this basis only if it is not even "hypothetically possible" that the infringement could have affected the revenues, such as when the revenues were determined prior to the infringement. Bouchat, 346 F.3d at 524.

The second method by which a defendant can challenge the connection between the infringement and the claimed revenues on summary judgment is to argue that, although there may be a conceivable connection, the plaintiff has not presented sufficient evidence of a causal link between the infringement and the claimed revenues. If a defendant makes this argument, the plaintiff must respond by providing some "'non-speculative evidence that would . . . suggest a link between the infringement and the [defendant's] supposedly enhanced

61

revenues.'" Id. at 525 (omission provided) (alteration in Bouchat) (quoting Mackie, 296 F.3d at 911). The plaintiff is not required at this step to show that the infringement was the primary cause of the defendant's revenues, and a fair degree of inference is allowed. Cf. Bonner, 404 F.3d at 294 (holding that where the claimed revenues were derived exclusively from a building that was constructed based on infringing architectural designs, the jury was required to find that a causal link had been established). However, the link provided by the plaintiff must be reasonable in light of the evidence. Bouchat, 346 F.3d at 525 n.10 (rejecting a link that "defie[d] credulity").

As a third option, a defendant can seek summary judgment on the basis that all of the claimed revenues are attributable to factors other than the infringement.[17] Although the defendant bears the statutory burden of proof on this issue, it can still raise a proper motion for summary judgment if it submits evidence that no reasonable jury could find that any portion of the claimed revenues is attributable to the infringement. Id. at 522. If the defendant's motion is properly supported, the

---

[17] We note that in the present case, the district court did not reach this question because it found that Dash had not met his burden of establishing that the claimed revenues were reasonably related to the infringement. See Dash, 2012 WL 1658934, at *4. Neither do we reach this issue. We discuss it here solely to provide a more complete statement of the law, especially given the role that this issue played in Bouchat.

plaintiff must respond with evidence "showing that 'reasonable minds could differ' on a material point," or summary judgment may be entered.  Id. (quoting Anderson, 477 U.S. at 250).

It is important to emphasize the distinction between what must be shown to demonstrate a causal link and what must be shown to rebut a defendant's argument that the revenues are not attributable to the infringement.  In order to demonstrate a causal link, the plaintiff must show that the infringement could reasonably be viewed as one of the causes of the claimed revenues.  In order to rebut a defendant's evidence that the claimed revenues are not attributable to the infringement, the plaintiff must show that at least some portion of the revenues was actually generated by the infringement, rather than by other factors.  If the revenues have some reasonable causal link to the infringement, but the evidence shows that they are attributable to other factors, the plaintiff will have satisfied his burden of demonstrating a causal link but failed to rebut the defendants' evidence that the revenues are not attributable to the infringement.  Bonner, 404 F.3d at 294-95 (finding that any reasonable jury would necessarily have found a causal link between an infringing building and the revenues it produced, but upholding the jury's verdict for the defendants because a reasonable jury could have found that the claimed revenues were

63

attributable solely to the non-infringing aspects of the building).

All three stages of the summary judgment analysis were illustrated in Bouchat. With respect to the first step, we upheld summary judgment as to some of the defendants' revenues because the plaintiff had not shown that those revenues, which were derived exclusively from preexisting contracts, might be conceivably connected to the infringement. Bouchat, 346 F.3d at 524. With respect to the remaining revenues, we first noted that the defendants had presented strong evidence that the claimed revenues were attributable solely to factors other than the infringement, as required to support a motion for summary judgment on that issue. Id. at 525. Because the plaintiff had declined to present any non-speculative evidence, he had both failed to adduce evidence of a causal link and failed to present evidence to challenge the defendant's evidence regarding attributability, rendering summary judgment appropriate on both bases. Id. at 525 & n.10.

2.

Here, many of the revenue streams claimed by Dash have no conceivable connection to the infringement because they involve revenues that consumers and businesses paid to Appellees, or agreed to pay Appellees, prior to discovering that "Yep" would be played. Cf. Bouchat, 346 F.3d at 524 (holding that the

64

infringement was not conceivably connected to revenues that the defendants were entitled to receive via contracts they had entered into prior to the infringement). As explained below, however, even with respect to the revenue streams for which a conceivable connection might exist, Dash has failed to provide nonspeculative evidence of a causal link between the infringement and the claimed revenues.

Specifically, Dash has stipulated that he has "no evidence that the playing of the 'Yep' song at Wrestlemania XXIV or the August 24, 2009 RAW show increased any of the WWE revenue streams." (J.A. 933). Nor has Dash provided evidence that the playing of "Yep" increased any of the other Appellees' revenue streams. Instead, Dash contends that he is not required to submit specific evidence linking the claimed revenue streams to the infringement.[18] He argues that because Wrestlemania XXIV and

---

[18] Dash also argues that he should not be required to show that the alleged infringement increased Appellees' revenue streams. Dash's argument is foreclosed by Bouchat, which specifically required "a causal link between the infringement and the level of the [defendants'] revenues." 346 F.3d at 524 (emphasis added); see also Mackie, 296 F.3d at 911 (requiring evidence that shows "a link between the infringement and the [defendant's] supposedly enhanced revenues" (emphasis added)).

Additionally, Dash was required to show not merely that Appellees generated more revenue from playing "Yep" than from playing no song, but that they generated more revenue from playing "Yep" than from playing a non-infringing song. See Bouchat, 346 F.3d at 525 n.10 (discussing whether the defendants' revenues were affected by "the team's adoption of (Continued)

the August 24, 2009, RAW broadcast included "Yep," the revenues from those events, like the revenues from the building in Bonner, were "derived exclusively from the infringed" work, and that this fact alone is sufficient to establish a causal link. Bonner, 404 F.3d at 294.

It is true that in some cases, like Bonner, the infringement will form such a significant aspect of the product generating the claimed revenues that no further evidence will be required to establish that those revenues were causally linked to the infringement. See id. However, when, as here, the infringing content forms only a small, incidental portion of the products that generated the claimed revenue streams, further evidence is necessary to link the claimed revenues to the infringement. See Bouchat, 346 F.3d at 525 n.10; cf. Walker, 28 F.3d at 415 (holding that when "the infringement occurs as a small part of a much larger work, the fact finder properly focuses not on the profit of the work overall, but only on the profit that the infringement contributes"). Indeed, like the infringing logo on the trading cards, video games, and game programs in Bouchat, it "defies credulity that a consumer would

_____

one logo design rather than another," not whether the defendants generated more revenue using an infringing logo design than they would have generated if the team had had no logo at all).

66

purchase" home videos of Wrestlemania XXIV simply to hear "Yep" played when Mayweather entered the ring or watch the August 24, 2009, RAW broadcast in hopes of hearing the song played again. 346 F.3d at 525 n.10. Further evidence was required before a reasonable trier of fact could find that Appellees' revenues were causally linked to their brief infringement of TGB. Because Dash failed to present such evidence, summary judgment was proper.

3.

Instead of attempting to show that the claimed revenues are reasonably related to the infringement, Dash has rested his case on the fact that those revenues derive from products that peripherally include infringing content. This is insufficient. See Bouchat, 346 F.3d at 525 (holding that the fact that products depicted an infringing logo did not establish a connection between the infringement and the revenue from the sale of those products). Because Dash provided the factfinder with no reasonable basis for concluding that the infringement contributed to Appellees' profits, the district court properly granted Appellees summary judgment on Dash's claim for profit damages.[19]

---

[19] In his briefs and at oral argument, Dash sets forth several hypotheticals involving deliberate infringement that he claims will follow unless copyright owners are allowed to (Continued)

IV.

For the foregoing reasons, the judgment of the district court, as to Dash's entitlement to both actual and profit damages under 17 U.S.C. § 504(b), is affirmed.

<u>AFFIRMED</u>

---

collect a portion of profits derived from works containing infringing content without showing that those profits are reasonably related to the infringement. As noted by the district court, this argument overlooks the existence of statutory damages, which, unlike profit damages, are designed not merely to compensate but to deter. <u>F.W. Woolworth Co. v. Contemporary Arts</u>, 344 U.S. 228, 234 (1952); <u>see also</u> <u>Walker</u>, 28 F.3d at 415 ("The[] award [of profit damages] is designed to remove from the defendant all benefit derived from the misappropriation of the plaintiff's intellectual property. This damages structure is not designed, as plaintiff's language suggests, to be punitive.").

Therefore, Dash's hypothetical scenarios do not convince us to reconsider the clear rule of law that a plaintiff cannot recover profit damages unless the claimed profits can be reasonably linked to the infringement. <u>Bonner</u>, 404 F.3d at 294; <u>Bouchat</u>, 346 F.3d at 522–23.

DAVIS, Circuit Judge, concurring in the judgment:

I concur in the judgment.