**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 14-1661**

ALISHA KINGERY, f/k/a Alisha Wilkes, on behalf of herself
and those similarly situated,

        Plaintiff - Appellant,

      v.

QUICKEN LOANS, INC.,

        Defendant - Appellee.

Appeal from the United States District Court for the Southern
District of West Virginia, at Charleston. Joseph R. Goodwin,
District Judge. (2:12-cv-01353)

Argued: September 15, 2015        Decided: November 12, 2015

Before DUNCAN and FLOYD, Circuit Judges, and HAMILTON, Senior
Circuit Judge.

Affirmed by unpublished per curiam opinion.

**ARGUED**: Deepak Gupta, GUPTA BECK PLLC, Washington, D.C., for
Appellant. John Curtis Lynch, TROUTMAN SANDERS LLP, Virginia
Beach, Virginia, for Appellee. **ON BRIEF**: John W. Barrett,
Jonathan R. Marshall, BAILEY & GLASSER, LLP, Charleston, West
Virginia; Leonard A. Bennett, Matthew J. Erausquin, Susan M.
Rotkis, CONSUMER LITIGATION ASSOCIATES, Newport News, Virginia;
Jonathan E. Taylor, GUPTA BECK PLLC, Washington, D.C.; Ian
Lyngklip, CONSUMER LAW CENTER, PLC, Southfield, Michigan; John
Charles Bazaz, Fairfax, Virginia, for Appellant. Jason Manning,
Megan Burns, TROUTMAN SANDERS LLP, Virginia Beach, Virginia, for

Appellee.

_____

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Alisha Kingery (Kingery) appeals the district court's grant of summary judgment in favor of Quicken Loans, Inc. (Quicken) with respect to her claim alleging Quicken failed to comply with the credit-score disclosure requirements set forth in 15 U.S.C. § 1681g(g)(1)(A), which are triggered when a mortgage lender "uses a consumer credit score . . . in connection with an application initiated or sought by a consumer for a closed end loan or the establishment of an open end loan for a consumer purpose that is secured by 1 to 4 units of residential real property . . . ." Id. § 1681g(g)(1). The district court granted summary judgment in favor of Quicken based upon its holding that the summary judgment record, when viewed in the light most favorable to Kingery and drawing all reasonable inferences in her favor, failed to establish that Quicken "use[d]" her credit score "in connection with" her inquiry about refinancing her current home mortgage loan, and therefore, Quicken never triggered § 1681g(g)(1)(A)'s credit-score disclosure requirements. Id. For the following reasons, we affirm.

I

3

Desiring to refinance her current home mortgage loan, on April 29, 2010, Kingery, formerly known as Alisha Wilkes, sent a loan inquiry to the website MortgageLoans.com.[1] MortgageLoans.com subsequently sent Kingery an email identifying Quicken as one of four potential lenders.[2] The email informed Kingery that Quicken would be contacting her within the next twenty-four hours. Within that timeframe, Quicken employee Matthew Muskan (Muskan) contacted Kingery to ask her permission to pull her credit reports. Kingery voluntarily granted Muskan permission.

Muskan electronically pulled Kingery's tri-merge credit report from First American CREDCO on May 3, 2010.[3] Within fifteen seconds, Kingery's tri-merge credit report appeared on Muskan's computer screen at Quicken. Her three credit scores in descending order, which appeared in the middle of the first page of Kingery's tri-merge credit report, were 669, 614, and 566.

---

[1] Because this appeal challenges the grant of summary judgment, the facts are presented based upon viewing the admissible evidence in the record in the light most favorable to Kingery as the nonmoving party and drawing all reasonable inferences in her favor. Pueschel v. Peters, 577 F.3d 558, 563 (4th Cir. 2009).

[2] This appeal only concerns Quicken and not the other three potential lenders.

[3] A tri-merge credit report consists of the raw data from the three major credit repositories merged into a single credit report.

Of relevance on appeal, beginning on the bottom of the first page and continuing onto the top of the second page, Kingery's tri-merge credit report showed that foreclosure proceedings had started against her on March 19, 2010, with respect to a $404,903 GMAC real estate mortgage that was almost two years in arrears ($58,109 total in arrears based on a monthly payment of $2,621).

During Muskan's deposition in this case three years later, he testified that he had no recollection of Kingery's loan inquiry, also known among Quicken employees as a loan lead. However, relying on internal Quicken computer records regarding Kingery's loan inquiry, the authenticity of which Kingery does not dispute, Muskan testified that he "clearly denied the loan for foreclosure." (J.A. 707). According to Muskan, the only way the code of denied for foreclosure was entered into Quicken's computer system was if "[he] would have to -- manually . . . click and deny her out for foreclosure." Id.

Within a week of Quicken denying Kingery's loan inquiry, Quicken internally transferred it to a consultant within its twelve-month credit repair program known as Fresh Start. According to Quicken's answer to one of Kingery's interrogatory requests, "[t]he Fresh Start Program is a credit repair team that works with loan leads to attempt to develop them into loan applications where the lead is preliminarily denied in

5

Quicken['s] internal lead inquiry system." (J.A. 654). After the Fresh Start consultant made unsuccessful efforts to transform Kingery's loan inquiry into a loan application, on May 24, 2010, Kingery's loan inquiry was coded in Quicken's loan origination computer system as a final denial.

The loan denial letter that Quicken sent Kingery, dated May 24, 2010, states the following as the reason for denying her loan inquiry: "Credit History: Current/previous slow payments, judgments, liens or B[ankruptcy]." (J.A. 104). On the same day, Quicken sent Kingery a document entitled "CREDIT SCORE NOTICE," which listed her credit scores with Equifax BEACON, Experian, and TransUnion and stated the key factors affecting such scores. The document also gave the full statutory notice provision set forth in 15 U.S.C. § 1681g(g)(1)(D), which provides, inter alia: "In connection with your application for a home loan, the lender must disclose to you the score that a consumer reporting agency distributed to users and the lender used in connection with your home loan, and the key factors affecting your credit scores." 15 U.S.C. § 1681g(g)(1)(D).

The same letter also offered Kingery the opportunity to pay a fee to participate in Fresh Start. According to the letter, Quicken "designed [Fresh Start] to help [Kingery] improve [her] credit and [her] ability to qualify for credit-based financing." (J.A. 104).

6

Turning to the evening of the same day on which Muskan entered the computer code into Quicken's computer system to deny Kingery's loan inquiry because she was in foreclosure proceedings, a Quicken computer program considered the potential for Kingery's loan inquiry to participate in a second layer of internal Quicken loan review known as Second Voice. However, because multiple bankers had already attempted to contact Kingery, the computer program's algorithm automatically excluded Kingery's loan inquiry from participation in Second Voice. Therefore, none of Kingery's credit scores were used in connection with Second Voice. Had Kingery's loan inquiry not been automatically excluded from Second Voice based upon a computer program algorithm, it subsequently would have been excluded on the basis that her middle credit score of 614 fell below the 620 credit score cut-off for participation in Second Voice.

The operative complaint in this case is the second amended complaint in which Kingery alleges Quicken violated 15 U.S.C. § 1681g(g), which provides, in relevant part:

Any person who makes or arranges loans and who uses a consumer credit score . . . in connection with an application initiated or sought by a consumer for a closed end loan or the establishment of an open end loan for a consumer purpose that is secured by 1 to 4 units of residential real property . . . shall provide the following to the consumer as soon as reasonably practicable: . . . [a copy of the consumer's credit scores, the key factors that adversely affected such

7

scores, and a copy of the statutory notice entitled NOTICE TO THE HOME LOAN APPLICANT].

Id. § 1681g(g)(1)(A). Notably, § 1681g(g)(1)(A) is triggered by a mortgage lender's use of a credit score in connection with a consumer's application for a mortgage but not its use of any other information contained in the balance of a consumer's credit report. Section 1681g(g)(1)(A)'s credit-score disclosure requirements are part of the Fair Credit Reporting Act (FCRA), 15 U.S.C. §§ 1681-1681x, which Act provides a private right of action against a mortgage lender who willfully or negligently fails to comply with § 1681g(g)(1)(A)'s credit-score disclosure requirements. Id. § 1681n (civil liability for willful noncompliance); § 1681o (civil liability for negligent noncompliance).

The crux of Kingery's theory of liability is that although Quicken sent her the credit-score disclosures required by § 1681g(g)(1)(A) on May 24, 2010, it did not send them as soon reasonably practicable after Quicken used her credit scores on May 3, 2010, in connection with her loan inquiry. Notably, Kingery's theory of FCRA liability assumes that Quicken actually used her credit scores in connection with her loan inquiry as contemplated by § 1681g(g)(1). Quicken took the position below and continues to take the same position on appeal that it never used Kingery's credit scores in connection with her loan inquiry

8

as contemplated by § 1681g(g)(1), and therefore, it never triggered § 1681g(g)(1)(A)'s credit-score disclosure requirements with respect to Kingery. And by way of explanation as to why Quicken sent Kingery credit-score disclosure documentation on May 24, 2010, Quicken points to the following portion of the affidavit of its Deputy Corporate Counsel Amy Bishop: "Because it would be too burdensome to make a determination of 'use' of a client's credit score on a case by case basis, Quicken Loans chose to be over-compliant by sending credit score disclosure notices even when the consumer's credit score is not 'used' in any manner 'in connection with an application.'" (J.A. 443).

Following the close of discovery, Quicken moved for summary judgment in its favor, which Kingery opposed. The district court ultimately granted summary judgment in favor of Quicken on the ground that Kingery failed to proffer sufficient evidence for a reasonable jury to find that Quicken had used her credit scores in connection with her loan inquiry under the ordinary plain meaning of the term "use." In reaching this ruling, the district court "conclude[d] that 'use' occurs under § 1681g(g) when the lender employs the consumer's score to achieve a purpose or objective, such as employing the score to make a decision with respect to a loan application." (J.A. 865-66). In so concluding, the district court relied upon the Supreme

9

Court's ordinary plain meaning analysis set forth in Smith v. United States, 508 U.S. 223 (1993), of the term "uses," as that term is found in 18 U.S.C. § 924(c)(1).

Section 924(c) mandates the imposition of specified criminal penalties if the defendant, "during and in relation to any crime of violence or drug trafficking crime . . . , uses . . . a firearm . . . ." 18 U.S.C. § 924(c)(1). Because the term "uses," as found in § 924(c)(1), is not statutorily defined, the Smith Court gave the term its ordinary and natural meaning, namely "to employ or to derive service from." Smith, 508 U.S. at 229 (citation and internal quotation marks omitted). Based upon this analysis, the Smith Court held that a criminal who trades his firearm for drugs uses it during and in relation to a drug trafficking crime within the meaning of § 924(c)(1), because trading a firearm for drugs falls squarely within the ordinary and natural meaning of the term use. Id. at 241.

In the present case, the district court found on the summary judgment record, viewed in the light most favorable to Kingery, that: (1) Quicken did not use, that is did not employ or derive service from, any of Kingery's three credit scores in connection with denying her loan inquiry; rather, Quicken only obtained, sorted, and stored Kingery's three credit scores, which conduct does not fall within the ordinary meaning of the term "use"; and (2) Quicken denied Kingery's loan inquiry for

the sole reason that her tri-merge credit report showed she was already in mortgage foreclosure proceedings on the very loan she sought to refinance. Because the district court concluded that Quicken did not trigger § 1681g(g)(1)(A)'s credit-score disclosure requirements with respect to Kingery's loan inquiry, the district court did not reach the timing issue.

This timely appeal followed.

## II

### A

We review the grant of summary judgment de novo. Pueschel, 577 F.3d at 563. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering the merits of the motion, we, like the district court, view the admissible evidence in the summary judgment record in the light most favorable to Kingery as the nonmoving party and draw all reasonable inferences in her favor. Pueschel, 577 F.3d at 563.

### B

Before addressing Kingery's precise arguments on appeal, for the sake of clarity, we take a moment to set forth the arguments she does not make on appeal. Kingery does not argue that Quicken lacked her permission to pull her credit scores

11

and/or her credit report information from the three major credit reporting agencies. Likewise, she does not argue that Quicken's subsequent action in pulling her tri-merge credit report violated FCRA in any manner. Moreover, Kingery concedes that the ordinary meaning of the term "use" connotes more than merely obtaining, possessing, or storing. Thus, Kingery concedes that Quicken's conduct in obtaining, possessing, and storing her credit scores in connection with her loan inquiry did not trigger § 1681g(g)(1)(A)'s credit-score disclosure requirements. Finally, with the exception of § 1681g(g)(1)(A)'s timeliness component, Kingery does not argue that the information Quicken sent her dated May 24, 2010 (three weeks after she submitted her loan inquiry to Quicken) failed to satisfy § 1681g(g)(1)(A)'s credit-score disclosure requirements.

C

Having just clarified the arguments Kingery does not make on appeal, we now turn to those she does make on appeal. In broad terms, Kingery argues that Quicken triggered § 1681g(g)(1)(A)'s credit-score disclosure requirements in at least one of four ways. She then follows up by arguing that the credit-score disclosure documents she received from Quicken approximately three weeks after she made her Quicken loan inquiry were untimely in that Quicken did not send them to her as soon as reasonably practicable.

12

Because we agree with the district court that Quicken did not "use[]" Kingery's credit scores "in connection with" her loan inquiry as necessary to trigger § 1681g(g)(1)(A)'s credit-score disclosure requirements, we also do not reach the timing issue presented by Kingery's claim. We now turn to address the four independent ways that Kingery argues Quicken triggered § 1681g(g)(1)(A)'s credit-score disclosure requirements with respect to her loan inquiry. In so doing, we give the term "uses" as found in § 1681g(g)(1) its ordinary meaning of "to employ or to derive service from," because such term is not statutorily defined, Smith, 508 U.S. at 229 (citation and internal quotation marks omitted), and such definition makes sense in the context of § 1681g(g)(1)'s broadly sweeping "in connection with" language, see id. ("Language, of course, cannot be interpreted apart from context."). See Smith, 508 U.S. at 228-30 (giving the term "uses" as found in 18 U.S.C. § 924(c)(1) its ordinary meaning of to employ or to derive service from because the term is not statutorily defined and the ordinary definition makes sense in the context of § 924(c)(1)'s sweeping "during and in relation to" a drug trafficking offense language).

1

Kingery argues that Quicken used her credit scores in connection with her loan inquiry as contemplated in §

13

1681g(g)(1) by integrating them into its computer system and projecting them onto Muskan's computer screen. The district court correctly rejected this argument. The record demonstrates only that once Quicken obtained Kingery's credit scores with her permission, it converted them into a different computer file format, sorted them into data fields using a computer program, and delivered them to Muskan via his computer screen. Because none of these actions in the mere handling of Kingery's credit scores constitute the employing of or the deriving service from such scores, none triggered § 1681g(g)(1)(A)'s credit-score disclosure requirements.

2

Kingery next argues that, viewing the record evidence in the light most favorable to her and drawing all reasonable inferences in her favor, a rational jury could infer that Muskan considered her credit scores in deciding to deny her loan inquiry, and thus triggered § 1681g(g)(1)(A)'s credit-score disclosure requirements. In support of this argument, Kingery points to no affirmative evidence that Muskan considered her credit scores in denying her loan inquiry. Instead, she points to the fact that Muskan has no independent recollection of her loan inquiry.

Kingery's argument is without merit. There is no evidence in the record from which a rational jury could infer that Muskan

14

consulted Kingery's credit scores and actually took them into account in denying her loan inquiry. The only evidence in the record on this point shows that Muskan denied Kingery's loan inquiry for the sole reason that Kingery was in mortgage foreclosure proceedings on the very loan she sought to refinance. Such evidence is: (1) a printout of the computer record made at the time Muskan denied Kingery's loan inquiry showing the fact that Kingery was in foreclosure proceedings as the reason he denied such loan inquiry; and (2) Muskan's deposition testimony, based upon his review of such computer printout record, that he necessarily denied her loan inquiry because she was in foreclosure proceedings. In the face of this uncontroverted evidence and the fact that Kingery does not dispute that her pending mortgage foreclosure proceedings would have been a sufficient ground upon which to deny her loan inquiry regardless of her credit scores, the jury would have to engage in impermissible speculation in order to make the finding Kingery suggests.

To bolster her argument, Kingery also contends that, at the summary judgment stage, Muskan's testimony should be ignored because Muskan, as an employee of Quicken, is not a disinterested witness and therefore, under Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000), the jury is not required to believe his testimony. In making this argument,

15

Kingery relies upon the following quote from Reeves: "[T]he court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." Id. at 151 (internal quotation marks omitted). Kingery interprets this quote broadly so as to require a district court considering a motion for summary judgment to ignore the uncontroverted testimony of all employees of a company moving for summary judgment.

We have wisely rejected this broad reading of Reeves, albeit in an unpublished opinion. See Luh v. J.M. Huber Corp., 211 F. App'x 143, 146 (4th Cir. 2006). In so rejecting, we began by pointing out that "Reeves states the noncontroversial position that witness testimony that the jury is not required to believe cannot be used to sustain a summary judgment decision, since the jury is not required to believe their testimony." Id. We then looked to the Supreme Court's holding in Chesapeake & Ohio Ry. Co. v. Martin, 283 U.S. 209 (1931), that the testimony of an employee of the defendant must be taken as true when such testimony discloses no lack of candor, the employee witness went unimpeached, his credibility was not questioned, and the accuracy of his testimony is not controverted by evidence, although if it were inaccurate, it readily could be shown to be

16

so. Chesapeake & Ohio Ry. Co., 283 U.S. at 216. Other circuits have also rejected the broad reading of Reeves pressed by Kingery. LaFrenier v. Kinirey, 550 F.3d 166, 168 (1st Cir. 2008); Stratienko v. Cordis Corp., 429 F.3d 592, 597-98 (6th Cir. 2005). Applying the holding of Chesapeake & Ohio Ry. Co. here, the status of Muskan as an employee of Quicken is insufficient by itself to create a jury question on his veracity as long as his testimony disclosed no lack of candor, he was not impeached, his credibility was not questioned, and the accuracy of his testimony was not controverted by evidence, although if it were inaccurate it readily could have been shown to be so. Based upon this test, we have no reason to ignore Muskan's testimony in deciding the merits of Quicken's motion for summary judgment.

Because the jury would be required to engage in impermissible speculation to find that Muskan had factored in Kingery's credit scores in his decision to deny her mortgage loan inquiry, Kingery cannot stave off Quicken's motion for summary judgment on this basis. See Dash v. Mayweather, 731 F.3d 303, 311 (4th Cir. 2013) (to defeat summary judgment, "nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence").

We next address Kingery's argument that because the minimum credit score for participation in Second Voice is 620, a reasonable jury could infer that Quicken used her middle credit score of 614 in connection with denying her loan inquiry. In making this argument, Kingery candidly recognizes the record contains the sworn declaration of Kevin Lang (Lang), Quicken's Director of Software Engineering, in which Lang declares that Quicken never used Kingery's credit scores in determining she failed to qualify for participation in Second Voice. Notably, Lang explained in his declaration that Quicken's computer program, which reviews the eligibility of previously denied loan inquiries for participation in Second Voice, automatically excluded, based on a computer algorithm, Kingery's loan inquiry from participation in Second Voice because multiple bankers had already attempted to contact her. Therefore, he declared, none of Kingery's credit scores were used in connection with Second Voice.

Again, relying on Reeves, Kingery argues the statements in Lang's sworn declaration cannot be credited at the summary judgment stage because Lang is a Quicken employee. For the same reasons Kingery's argument based on Reeves failed with respect to Muskan, it fails with respect to Lang. The relevant authority makes clear that the status of Lang as an employee of

Quicken is insufficient by itself to create a jury question on his veracity as long as his sworn statements disclose no lack of candor, he is unimpeached, his credibility has not been questioned, and the accuracy of his testimony is not controverted by evidence, although if it were inaccurate it readily could be shown to be so. Chesapeake & Ohio Ry. Co., 283 U.S. at 216. Based upon this test, we have no reason to ignore the statements in Lang's sworn declaration in deciding the merits of Quicken's motion for summary judgment. And considering those uncontroverted statements, no reasonable jury could infer that Quicken precluded her loan inquiry from participation in Second Voice because of her middle credit score of 614.

4

Lastly, we consider Kingery's argument pertaining to Fresh Start. Kingery argues that Quicken used her credit score of 614 to determine that she was eligible for Fresh Start, thereby triggering § 1681g(g)(1)(A)'s credit-score disclosure requirements. The sole evidence she points to in support of this argument is a statement in Quicken's internal training manual, dated November 16, 2012, which states that target clients for Fresh Start have a credit score under 620.

Kingery's Fresh Start argument fares no better than her prior three arguments. The reason is the same——lack of

19

sufficient evidence for a reasonable jury to find that Quicken used her credit score in connection with her loan inquiry. The only evidence in the record regarding why Quicken denied Kingery's loan inquiry is that it was denied because the very mortgage she sought to refinance was in foreclosure. Thus, the only reasonable inference to be made under this circumstance is that Quicken referred Kingery's loan inquiry to Fresh Start because of the foreclosure. On the flip side, under this circumstance, a reasonable jury would have to engage in impermissible speculation to find by a preponderance of the evidence that Quicken actually used Kingery's credit scores of 614 or 566 in referring her loan inquiry to Fresh Start based solely on a statement in Quicken's training manual dated one and one half years after Quicken referred Kingery's loan inquiry to Fresh Start. See Dash, 731 F.3d at 311 (mere speculation insufficient to defeat summary judgment). This is what we call a scintilla of evidence, and it is insufficient to stave off Quicken's motion for summary judgment. Id. (mere scintilla of evidence insufficient to defeat summary judgment). In sum, Kingery gets nowhere on her Fresh Start argument.[4]

---

[4] We note that Quicken argues that Kingery failed below to make her argument pertaining to Fresh Start in opposition to its motion for summary judgment, and therefore, Kingery waived her right to press it on appeal. Kingery responds that she made the argument below, and even if she did not, under Yee v. City of (Continued)

## III

In conclusion, because Kingery failed to proffer sufficient evidence, when viewed in the light most favorable to her and drawing all reasonable inferences in her favor, to create a genuine issue of material fact that Quicken used at least one of her three credit scores in connection with her loan inquiry seeking to refinance her foreclosure-burdened mortgage as the term "use[d]" is found in § 1681g(g)(1), we affirm the district court's grant of Quicken's motion for summary judgment.

AFFIRMED

---

Escondido, 503 U.S. 519, 534 (1992), she has the right to press the argument on appeal. See id. ("Once a federal claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below."). Having reviewed the record, we agree with Quicken that Kingery failed below to make her argument pertaining to Fresh Start that she now makes on appeal. Indeed, such failure explains why the district court did not address it. Nevertheless, because we reject the argument on the merits, we decline to reach the waiver issue.